STATE of Alaska, Jay S. Hammond, Governor of the State of Alaska; Robert LeResche, and Theodore Smith, Appellants and Cross-Appellees,

v.

J.C. WEIDNER, Harold R. Herning, Steve Sunderlin, Rudy Renkert, and Sue Renkert, Appellees and Cross-Appellants.

Helen HOWARD, Charles I. Goff, Jr., Conrad Winegeart, Dwight W. Hales, Richard Brusell, James P. Sullivan, Wayne Reeves, Thomas Malone, Charles Rosenberry, Marlene J. Robinson, Patsy Malone, William E. Whipple, David Webber, Carol L. Wells, Clayton Wells, and Jeanette A. James, all being Potlatch Ponds Lottery Winners, Appellants and Cross-Appellees.

v.

J.C. WEIDNER, Harold R. Herning, Steve Sunderlin, Rudy Renkert, and Sue Renkert, Appellees and Cross-Appellants.

Nos. 6220, 6272 and 6240.

Supreme Court of Alaska.

May 18, 1984.

James N. Reeves, Bogle & Gates, Anchorage, Douglas K. Mertz, Asst. Atty. Gen., and Wilson L. Condon, Atty. Gen., Juneau, for appellants and cross-appellees.

Stephan H. Williams, Law Offices of Charles E. Cole, and Matt O'Meara, Fairbanks, for appellees and cross-appellants.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

BURKE, Chief Justice.

This appeal involves a challenge to the legality of an agricultural land lottery disposing of approximately 14,000 acres in the Fairbanks North Star Borough.

The lottery sale was scheduled for June 26, 27, and 29, 1980, by the Alaska Department of Natural Resources [DNR]. J.C. Weidner, Harold R. Herning, Steve Sunderlin, Rudy Renkert and Sue Renkert [hereinafter referred to collectively as Weidner], local property owners, sought to block the

lottery by means of an action for declaratory judgment and injunctive relief.

The superior court issued an interlocutory order permitting the lottery to proceed but prohibiting the state from transferring or conveying any interest to successful applicants until the court could render a decision on the merits. Pursuant to this order, the lottery was held and the successful applicants identified, but no conveyance, transfer or entry was made.

The parties filed cross-motions for summary judgment and the lottery winners moved to intervene on all counts. The superior court found that there was a reasonable basis for the disposal decision by the Commissioner of the DNR, but granted summary judgment in favor of Weidner on five issues, holding: (1) the DNR, contrary to AS 38.04.065 (Supp.1980), failed to develop land use plans prior to classification of the land as agricultural; (2) the lottery contravened the disposal schedule mandated by AS 38.05.047 (Supp.1980); (3) the Commissioner's classification decision was subject to improper legislative interference and, therefore, was not an independent, reasoned decision; (4) the DNR violated borough subdivision requirements; and (5) the sale violated AS 38.05.300 (Supp.1980), by closing certain parcels larger than 640 acres to multiple purpose use. The court denied Weidner's claim that the $100 per acre figure set by the state violated the prohibition against disposing of state land for less than its fair market value. Intervention by the lottery winners was denied except as to count IV of Weidner's complaint.[1]

Cross appeals followed. Central to the appeals is whether the land sale was invalid and whether intervention by the lottery winners was properly denied.

I

Weidner's first argument is one of statutory interpretation. Weidner contends that

because the DNR did not develop a land use plan for the lottery area prior to classifying it agricultural, the DNR was in violation of the statutory mandate of AS 38.04.065 (Supp.1980). In pertinent part, AS 38.04.065 provides:

(a) The commissioner shall, with local governmental and public involvement in accordance with AS 38.05.305, develop, maintain and, when appropriate, revise land use plans which provide, by regions or areas, for the use of the state-owned land.

. . . .

(d) Official regional or area plans and subsequent amendments adopted by the commissioner after public and local governmental participation shall be signed and dated by the commissioner. After adoption of an official regional or area plan, land classifications shall be made in accordance with these official plans.

■ Although we agree that AS 38.04.065(d) (Supp.1980) generally requires the development of use plans before classification, there was an exception in effect at the time, contained in former AS 38.05.047 (Supp.1980).[2] According to AS 38.05.047(a)(5)(C) (Supp.1980), the Commissioner was directed to classify, before September 1, 1980, those lands which he determined were best suited for agricultural use:

(a) Notwithstanding the provisions of AS 38.04, before September 1, 1980, the commissioner shall classify all state land in a municipality which he determines is best suited for

. . . .

(5) management by the state after September 1, 1980, for the following purposes:

. . . .

(C) disposal for agricultural use;

. . . .

Thus, the Commissioner's classification of the Potlatch Ponds area as agricultural pri-

---

1. Count IV alleged that the Commissioner's decision to classify Potlatch Ponds as agricultural was arbitrary, capricious, and constituted an abuse of discretion.

2. Former AS 38.05.047 (Supp.1980) was repealed by § 45, ch. 113, SLA 1981.

or to land use plan development was consistent with, rather than in violation of, existing law.[3]

## II

The superior court found that the Commissioner's classification and disposal decision had a reasonable basis, stating:

> If the court were to deal only with the Commissioner's determination ... under the reasonable basis test, it cannot be said that the ... determination was arbitrary, capricious, or prompted by corruption.

*See North Slope Borough v. LeResche*, 581 P.2d 1112, 1115 (Alaska 1978) (administrative agency's decision should stand unless the court determines that it was arbitrary, unreasonable or an abuse of discretion). The court, nevertheless, ruled in favor of Weidner, stating: "It cannot be said that ... political pressure did not have a substantial effect on the Commissioner's decision." Memorandum Decision at 8. Summary judgment was granted because that decision was "politically motivated," and not the result of the Commissioner's "independent judgment." *Id.* The court explained its ruling, as follows:

> [T]he determination ... was not an independent decision of the Commissioner, but [was one] influenced by the legislature and a legislative delegation from the Fairbanks area. The Commissioner may have made the determination even without the legislative influence, but this court cannot say based on the record that this decision was an independent reasoned decision.

*Id.* at 7.

■ This ruling was made in the context of an order granting summary judgment. *See* Rule 56(c), Alaska R.Civ.P. Where there is conflicting evidence, sufficient to establish a genuine issue of material fact, summary judgment is not authorized, unless it can be said that a party is otherwise entitled to judgment as a matter of law. *Stanfill v. City of Fairbanks*, 659 P.2d 579, 581 (Alaska 1983). Thus, before granting summary judgment in Weidner's favor, the court was required to find that there was no genuine issue of material fact, concerning Weidner's claim that the Commissioner's decision was not an independent, reasoned decision. As we read its decision, the court, instead, granted summary judgment on the ground that it was unable to say, as a matter of law, that the decision was *not* tainted by political influence.

■ Although there is evidence in the record that certain legislators attempted to influence the Commissioner's decision, the record also contains evidence that, despite such pressure, the Commissioner's decision was his own. In reaching its decision, the court was required to view such evidence in the light most favorable to the DNR, drawing all reasonable inferences in favor of the DNR and against Weidner. *Id.* Thus viewed, we believe that there was a genuine issue of material fact that precluded entry of summary judgment in Weidner's favor. We hold, therefore, that the court erred in granting such relief.

■ The Commissioner must make his own decision in such matters. But, evidence that others have attempted to sway his judgment, while certainly relevant, is not sufficient reason, by itself, to conclude that his decision is necessarily not his own. It is highly unlikely that such decisions can ever be made free of all external influence, some of it improper. The question that must be determined is whether, in light of such influence, the decision still can be said to have been independently made, upon a reasonable basis.[4]

---

**3.** Although the superior court held that the proposed June, 1980 lottery sale violated the statutory timetable of AS 38.05.047 (Supp.1980) (disposal of agricultural land to occur *after* September 1, 1980), providing cause to invalidate the sale, we need not reach this issue. Regardless of interpretation, the point is moot and will not affect our ultimate decision.

**4.** The superior court recognized that in reviewing an administrative agency's decision, where questions of fact and law involve agency expertise and/or broad policy considerations, it

■ In arguing that the Commissioner's decision was otherwise arbitrary, unreasonable or an abuse of discretion, and, therefore, without a reasonable basis, Weidner relies upon a policy statement issued by the DNR in November, 1979.[5] This "policy", however, was not a duly adopted departmental regulation. Thus, under our holding in *Kenai Peninsula Fisherman's Cooperative Association, Inc. v. State*, 628 P.2d 897, 906–07 (Alaska 1981), the Commissioner could not rely upon it in reaching his decision.[6] Weidner relies exclusively upon this "policy," in making the argument that the court erred in its conclusion that the Commissioner's decision had a reason-

able basis. He does not contend that the Commissioner's decision was otherwise erroneous on the merits. Thus, his argument fails.

### III

We next focus on whether the DNR failed to comply with the Fairbanks North Star Borough (FNSB) subdivision ordinances. The state has argued that because the FNSB declined to enforce the DNR's compliance with local ordinances regarding subdivision plats, no private party could require compliance. Weidner correctly states this argument as a question of standing.[7]

should apply a reasonable basis test. *North Slope Borough v. LeResche*, 581 P.2d 1112, 1115 (Alaska 1978); *Kelly v. Zamarello*, 486 P.2d 906, 916–17 (Alaska 1971). The reasonable basis standard is appropriate for determining "questions of law involving agency expertise." *Jager v. State*, 537 P.2d 1100, 1107 n. 23 (Alaska 1975).

5. This policy appeared as part of a DNR Agricultural Land Classification Report, mandated by AS 38.05.362(1). The policy stated:

> Criteria for Identifying Agricultural Lands. The *primary criterion* used in the identification of agricultural lands was designation by the U.S. Soil Conservation Service as Class II and III soils. These soils generally have slopes, soil depths, drainages, and nutritive qualities to support agricultural activities. *Though Class II and III soils criterion was specifically mentioned in the legislation mandating the classification of agricultural lands, it could not be strictly applied in the identification process without some modification.* The reason for this is that these classes of soils were seldom found in large, contiguous areas which conformed to legally describable or economically manageable parcels.... *In order to define meaningful parcels of land suitable for classification, it was decided that if any full section of land contained at least 50% Class II or III soils more or less uniformly dispersed throughout it, the entire section would be classified as agricultural.` On smaller parcels of land, if any quarter section of land contained 75% Class II or III soils, the entire quarter section would be classified agriculture.*

Alaska Department of Natural Resources, *Agricultural Land Classification Report*, 4 (Nov. 1979) (emphasis added).

6. A regulation that the Commissioner was required to consider was 11 AAC 55.050(a), which provides:

> Land classified agricultural is land which, by reason of its climate, physical features, and location, is suitable for present or future agricultural cultivation or development and that is intended for present or future agricultural use. When agricultural land is disposed of, only an agricultural interest may be conveyed.

Also, although the DNR was not required to develop land use plans prior to classification of the area, as indicated in part I of our opinion, AS 38.04.065(b) (Supp.1980) provided a basis for detailed land use planning and, therefore, some guidance to the Commissioner. That section provides:

> (b) In the development and revision of land use plans, the commissioner shall
> (1) use and observe the principles of multiple use and sustained yield;
> (2) consider physical, economic, and social factors affecting the region or area and involve other agencies and the public in achieving a systematic interdisciplinary approach;
> (3) give priority to planning and classification in areas of potential settlement and critical environmental concern;
> (4) rely, to the extent that it is available, on the inventory of the state land, its resources, and other values;
> (5) consider present and potential uses of state land;
> (6) consider the supply, resources, and present and potential use of land under other ownership within the area or region of concern;
> (7) plan for compatible surface and mineral land use classifications;
> ....

7. *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26, 36–37 (1975) provides a test for determining whether a private remedy is implicit in a statute that does not expressly provide for such. The *Cort* analysis, however, does not ap-

The threshold consideration in determining whether the plaintiffs have standing to seek judicial review is whether they have a sufficient personal stake in the outcome of the controversy. *Moore v. State*, 553 P.2d 8, 23 (Alaska 1976). Where the question concerns subdivision planning approval or zoning change, various courts have held that property owners adjacent to the land have the necessary interest required for standing. *Renard v. Dade County*, 261 So.2d 832, 837 (Fla.1972); *Reynolds v. Dittmer*, 312 N.W.2d 75, 78 (Iowa App.1981); *Douglaston Civic Association, Inc. v. Galvin*, 36 N.Y.2d 1, 364 N.Y.S.2d 830, 833–834, 324. N.E.2d 317, 320–21 (1974); *E. Grossman & Sons, Inc. v. Rocha*, 118 R.I. 276, 373 A.2d 496, 498 (1977). *See Little Joseph Realty, Inc. v. Town of Babylon*, 41 N.Y.2d 738, 395 N.Y.S.2d 428, 363 N.E.2d 1163 (1977) (an aggrieved taxpayer or property owner in municipality has standing to maintain an action to enjoin zoning or planning violations notwithstanding the fact that the statute authorizes municipal authorities to enjoin such actions). As property owners within the Potlatch Ponds area, Weidner had a "sufficient personal stake in the outcome of the controversy to guarantee 'the adversity which is fundamental to judicial proceedings,' " *State v. Lewis*, 559 P.2d 630, 634–35 (Alaska 1977) *quoting Moore v. State*, 553 P.2d 8, 23 (Alaska 1976), and, therefore, had standing.

The state next argues that because the Potlatch Ponds lottery was not a sale of a subdivision within the meaning of AS 29.-78.010(16) and AS 40.15.190(2), the DNR was not required to submit subdivision plats for borough approval. We disagree with the state's claim that Potlatch Ponds was not a "sale" and, therefore, not subject to the subdivision regulations of the FNSB.

Under AS 29.78.010(16) and AS 40.15.-190(2), a subdivision is "the division of a tract or parcel of land into two or more lots, sites, or other divisions for the purpose, whether immediate or future, of sale or building development, and ... relates ... to the land or areas subdivided." The state's argument, premised on the assertion that the Potlatch Ponds agricultural lottery is neither a "sale" nor for the purpose of "building development," lacks merit. There is nothing to indicate that the legislature intended to exempt agricultural disposals from statutory requirements relating to subdivisions. To the contrary, state statutes in all relevant instances refer to the conveyance of state land for agricultural use as a "sale ... [of] partial rights to the fee simple estate, including conveyance of agricultural use rights," which involves the conveyance of a "limited or conditional title." AS 38.04.030, 38.04.035(5).[8]

It not only is clear that the Potlatch Ponds lottery is a sale of rights in state land and falls under the statutory control of AS 29.78.010(16) and FNSB ordinances, *see* FNSB Code of Ordinances Title 17, § 17.04.030B (all lands within the borough which are to be divided shall be shown on a plat and approved by the FNSB Planning Commission), but that Potlatch Ponds qualifies as a sale of a subdivision. Under AS 38.04.045(a) (Supp.1980), state land which is to be conveyed in fee simple or less than fee simple estate shall be subdivided.[9] Thus, a fair characterization of

ply here. Weidner's claim of DNR noncompliance with borough subdivision requirements is not a claim for damages under a statute but a request for a declaratory judgment and injunctive relief.

**8.** *See also* AS 38.05.050 (Commissioner to "determine the lands to be sold, the limitations and conditions which attach to the land sold, and the terms of the sale"); 38.05.057 (requirements with respect to land sold by lottery, "including land limited to use for agricultural purposes"); 38.05.065 (terms of contract of sale for land sold by lottery); 38.05.069(a) (preference rights

where a determination is made to "sell or lease" land for agricultural purposes).

**9.** The state argues that even if Potlatch Ponds is a subdivision sale, AS 29.33.150(b) (Supp.1980) prevents the borough· from disapproving the subdivision plat. AS 29.33.150(b) (Supp.1980) provided in part· that:

The regulations adopted under (a) of this section apply to subdivision plats of undeveloped state land for disposal under AS 38.05 or AS 38.08 filed with the platting board, except that the platting board may not disapprove the

the Potlatch Ponds lottery is a proposed sale of some 14,000 acres which have been subdivided into sixty-one contiguous parcels. As such, the DNR was required to submit subdivision plans to the FNSB for borough approval.

The state's final argument is that even if Potlatch Ponds is a subdivision sale, the FNSB waived compliance with its regulations and requirements. The state's argument is not persuasive.

It is mandated by AS 40.15.200 (Supp. 1980) and AS 38.04.045(b) (Supp.1980) that state subdivisions "comply with ordinances and other local regulations ... in the same manner and to the same extent as subdivisions made by other landowners." It is further mandated by AS 40.15.010 and AS 40.15.070 that all subdivisions or dedications of land be submitted to the borough planning commission for approval. Finally, by statute, the planning commission either approves or may waive preparation, submission for approval, and filing of a plat if the conveyance is not made for the purpose of or in connection with a subdivision development. AS 29.33.160 (Supp.1980); AS 29.-33.170.

▮▮▮▮ The state's assertion that an advisory vote by the FNSB Assembly advising the borough administration not to file a suit to enjoin the lottery sale, taken at a work session meeting on June 19, 1980, constituted a waiver of the submission of subdivision plats, is in contradiction to statutory authority. The Assembly has no power either under state law or FNSB ordinances to approve subdivision plats or waive subdivision requirements. The Planning Commission is the sole authority from which plat approval or waiver of subdivision requirements may be obtained. The vote at the Assembly work session simply advised the FNSB mayor and the attorney's office not to proceed with a lawsuit to enjoin the lottery disposal because of the DNR's failure to comply with borough subdivision requirements.[10]

▮▮▮ For the reasons stated above, we conclude that the superior court was correct in holding that the DNR failed to comply with the borough's subdivision ordinances and that the lottery sale was, therefore, invalid.

## IV

We next consider Weidner's argument which challenges the DNR's agricultural classification of two of the lottery parcels exceeding 640 acres. Under AS 38.05.300 (Supp.1980) no state land shall be closed to multiple purpose use except by act of the state legislature, if the area involved contains more than 640 acres. Weidner asserts that agricultural classification has the effect of closing the two parcels to multiple purpose use in violation of AS 38.05.300 (Supp.1980). The superior court accepted this argument. We disagree with this interpretation of AS 38.05.300 (Supp.1980).

▮▮▮ In each instance where the legislature has referred to AS 38.05.300 (Supp. 1980), the reference is to management of *retained* state land.[11] In no case has the

---

subdivision plat or adopt regulations *which require the state to construct access roads or capital improvements on state land included in the subdivision plat.*
(Emphasis added).

The state has misunderstood and misconstrued the statutory language. AS 29.33.150(b) (Supp.1980) does not regulate the platting board's approval/disapproval of subdivision plats as a whole but only those plats "which require the state to construct access roads or capital improvements on state land." This interpretation is consistent with the statutory provisions concerning subdivisions.

10. The FNSB Planning Commission did waive certain technical requirements dealing with, for example, the scale of the plat drawings and the size of the sheets, but at no time did it waive conditions which were judged to affect potential purchasers of the land and the public. The FNSB did not approve the preliminary plats of Potlatch Ponds nor the "supplemental cadastral easement plats" submitted as final plats for the area. No final subdivision plat was ever filed.

11. In AS 41.21.410, for example, the legislature created the Captain Cook State Recreation Area, a "restricted use" area, and stated that:

Under AS 38.05.300, state land ... containing more than 640 acres may be closed to multiple purpose use only by act of the legislature. Because the area described in AS 41.21.415

legislature given indication that AS 38.05.-300 (Supp.1980) has any relation to whether state lands could or could not be disposed of. Agricultural classification of the two parcels exceeding 640 acres was not for management purposes to which AS 38.05.-300 (Supp.1980) would apply, but for the purpose of disposal by lottery. Hence, the land ceases to be state land and thereafter the state has no continuing duty to manage it for multiple purpose use. Therefore, contrary to Weidner's interpretation, the legislature intended AS 38.05.300 (Supp. 1980) to refer to the management of retained state lands and not to prohibit the DNR from disposing of parcels of state land greater than 640 acres in size.

## V

Weidner's final argument is that the DNR did not comply with statutory appraisal requirements found in AS 38.05.310 (Supp.1980) [12] and, therefore, failed to make a proper determination for sale of the land at less than the fair market value, as required by AS 38.05.057 (Supp.1980).[13]

AS 38.05.310(a) (Supp.1980) prohibits the sale or lease of land unless it has been appraised within 120 days before the date fixed for the sale or lease. It is within the Commissioner's discretion, according to AS 38.05.057 (Supp.1980), to dispose of agricul-

tural land at a price below fair market value if it is determined that unrealistic land values have resulted from scarcity of land for private use in the area. But in either case, the purchase price may not be less than $100 per acre.

In the DNR's "Administrative Findings and Decision" for the Potlatch Ponds area, dated May 19, 1980, the Commissioner and the Director of the Division of Forest, Land & Water Management jointly determined that, consistent with AS 38.05.057 (Supp.1980) and in satisfaction of AS 38.05.310 (Supp.1980), the fair market value of the Potlatch Ponds area would be $100 per acre. The record, however, indicates that the DNR decided to sell *all* agricultural land in their 1980 lotteries at $100 per acre, the statutory minimum at that time. According to an internal DNR memorandum, circulated in August, 1979, "[n]o appraisal will be necessary on agricultural land in the FY80 [fiscal year 1980] Disposal Program." Based on this memorandum, the Department's "Administrative Findings and Decision" of May, 1980, and the absence of any contrary evidence, it appears that the DNR routinely applied the $100 statutory minimum without making any real inquiry into the market value of the Potlatch Pond parcels. In our judgment, this form of "appraisal" does not

exceeds 640 acres, AS 41.21.410—41.21.425 are intended to provide for the closing of the described land and water to multiple purpose use in conformity with AS 38.05.300. . . .

The same language is used in AS 41.20.100 (creating Chilkat State Park), AS 41.21.120 (creating Chugach State Park), AS 41.21.130 (creating Kachemak Bay State Park), AS 41.21.150 (creating Denali State Park), and AS 41.21.430 (creating Caines Head State Recreation Area). Similar language is used in AS 41.21.160 (creating Wook-Tikchik State Park), AS 41.21.450 (creating Nancy Lake State Recreation Area), and AS 41.21.470 (creating Chena River Recreation Area).

12. AS 38.05.310 (Supp.1980) provides:

(a) No land may be sold or leased, or a renewal lease issued, except in the case of an oil or gas or mineral lease, unless it has been appraised within 120 days before the date fixed for the sale or lease. . . . No land may be sold or leased for less than the approved, appraised market value, except as provided in

AS 38.05.315, 38.05.320, 38.05.057, 38.05.075—38.05.085 and 38.05.097.

(b) Appraisals required by this section may be made by employees of the department who are qualified to determine the value of land under standards set by the commissioner.

13. At the time of the lottery, AS 38.05.057 (Supp. 1980) provided in relevant part as follows:

(a) The commissioner may dispose of land, including land limited to use for agricultural purposes, by lottery. The purchase price of land sold by lottery shall be the fair market value of the land as determined by the commissioner, but may not be less than $400 per acre, or if the land is limited to use for agricultural purposes, the purchase price may not be less than $100 per acre. The commissioner may sell land by lottery for less than the fair market value of the land if he determines that scarcity of land for private use in the area of the land to be sold has resulted in unrealistic land values. . . .

satisfy the appraisal requirement of AS 38.05.310 (Supp.1980).

 Even assuming that the DNR's decision was an "appraisal" within the meaning of AS 38.05.310 (Supp.1980), it is our further conclusion that there was insufficient evidence to support the Department's sale price of $100 per acre. In order for that price to be appropriate under the relevant statutes, one of two circumstances must exist: either the parcels must have a fair market value no greater than $100 per acre (AS 38.05.310(a) (Supp.1980)), or scarcity of land for private use in that area must have resulted in unrealistic land values (AS 38.05.057(a) (Supp.1980)).[14]

 The record contains no evidence of how the sale price of $100 per acre was reached. While neither AS 38.050.310 (Supp.1980) nor AS 38.05.057 (Supp.1980) require an appraisal report, nevertheless the DNR must demonstrate an evidentiary basis for its appraisal. Since such evidence is lacking, we hold that the DNR's "Administrative Findings and Decision" of May, 1980, do not satisfy the appraisal requirement of AS 38.05.310 (Supp.1980).

## VI

The final issue before this court is whether the superior court properly denied intervention by the lottery sale winners as to all but count IV of Weidner's complaint. We conclude that the superior court did not abuse its discretion.

 The lottery winners first assert that the court erred in finding that they were not entitled to intervene as a matter of right under Civil Rule 24(a). A four-part test is imposed to determine if the court is required to grant intervention as a matter of right: (1) the motion must be timely; (2) the applicant must show an interest in the subject matter of the action; (3) it must be shown that this interest may be impaired as a consequence of the action; and (4) it must be shown that the interest is not adequately represented by an existing party. *Foster v. Gueory*, 655 F.2d 1319, 1324–25 (D.C.Cir.1981).

 To satisfy part (2) of the test, the requisite interest for intervention as a matter of right must be direct, substantial, and significantly protectable. A contingent interest is insufficient to satisfy part (2) of the test. Viewed from the posture of pre-sale injunction, the court order allowed the lottery to be conducted in the interest of administrative efficiency and convenience, but specifically ordered that no interest or title would vest in the lottery winners pending the outcome of this litigation. The lottery winners therefore lacked the requisite interest to satisfy part (2) of the test.

 Part (4) of the test requires the party seeking intervention as a matter of right to show that its interest is inadequately represented by the existing party to the suit. "Inadequacy" is proven by a showing of collusion, adversity of interest, possible nonfeasance, or incompetence. *Curtis v. United Transportation Union*, 486 F.Supp. 966, 980 (E.D.Ark.1979).

 Even with a cautious approach toward the denial of intervention, *see, e.g., Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686, 694 n. 10 (1972), where there is virtual identity of the existing and would-be parties' interests, representation is adequate. *Curtis*, 486 F.Supp. at 981; *Commonwealth of Virginia v. Westinghouse Electric Corp.*, 542 F.2d 214, 216 (4th Cir.1976). The lottery winners therefore failed to satisfy part (4)

---

**14.** Apparently the DNR decided that the Potlatch Ponds parcels had a fair market value no greater than $100 per acre. The State has argued before this court both that the Potlatch Ponds parcels had a fair market value no greater than $100 per acre, and that scarcity of land for private use in the area has resulted in unrealistic land values. The only "evidence" to support the latter contention is the state's assertions in its briefs. This court will not consider such assertions. *See Sumner Development Corp. v. Shivers*, 517 P.2d 757, 763–64 (Alaska 1974). Moreover, there is nothing in the record to indicate that the Commissioner made any findings concerning scarcity of land for private use in the Potlatch Ponds area.

of the test as there is identity of interest without collusion or incompetence.

The lottery winners next argue that even if they were not entitled to intervene as a matter of right, the superior court abused its discretion in denying permissive intervention under Civil Rule 24(b). Under Civil Rule 24(b), regardless of the stated basis for intervention, the court has discretion to grant or deny intervention. The court must determine whether or not intervention would unduly delay or prejudice the adjudication of the rights of the original parties. Recognizing that additional parties are always the source of additional questions, briefs, objections, arguments and motions, where no new issues are presented, the most effective and expeditious way to participate is by a brief amicus curiae and not by intervention. *Crosby Steam Gage & Valve Co. v. Manning, Maxwell & Moore, Inc.,* 51 F.Supp. 972, 973 (D.C.Mass.1943); *see United States v. American Institute of Real Estate Appraisers of the National Association of Realtors,* 442 F.Supp. 1072, 1083 (N.D.Ill. 1977); 7A C. Wright & K. Miller, Federal Practice and Procedure § 1913 (1972).

We conclude that the superior court did not abuse its discretion by denying intervention.

The judgment of the superior court is AFFIRMED.