**ALASKA SURVIVAL, Paul Bratton, Judy Price, G.M. Chartrand, and Millie Gray, Appellants,**

v.

**STATE of Alaska, DEPARTMENT of NATURAL RESOURCES; Esther C. Wunnicke, Commissioner, State of Alaska, Department of Natural Resources; and Thomas Hawkins, Director, Division of Forest, Land and Water Management, State of Alaska, Department of Natural Resources, Appellees.**

**No. S–996.**

Supreme Court of Alaska.

Aug. 29, 1986.

Rehearing Denied Oct. 29, 1986.

Robert W. Adler, Eric Smith, Stephan H. Williams, Trustees for Alaska, Anchorage, for appellants.

M. Francis Neville, Asst. Atty. Gen., Anchorage, and Harold M. Brown, Atty. Gen., Juneau, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This appeal challenges a state land disposal of thirty-two agricultural homesteads near Talkeetna. A group of local residents sued to block the 3,530–acre offering. The superior court upheld the decision of the State Department of Natural Resources (DNR) to dispose of the land in a September 1984 lottery. We conclude that the disposal was invalid because DNR failed to comply with the land use planning process mandated by statute. We reverse the superior court judgment and remand DNR's disposal decision for reconsideration by the agency. We also conclude that the court erred in denying the plaintiffs status as public interest litigants for purposes of awarding attorney's fees.

## I. FACTS AND PROCEDURAL HISTORY

The land disposal at issue, referred to as "Chase III," is located approximately five miles north of Talkeetna, near the community of Chase. The state first proposed to offer land in this area for agricultural development in 1979. Between 1979 and 1983

DNR held several public hearings in Talkeetna to discuss what it initially proposed to be a commercial agriculture project involving disposal of parcels ranging in size to 560 acres.

Local residents repeatedly objected that increased settlement would threaten their subsistence-type lifestyle and overtax area resources. Many Chase-area residents rely on the use of surrounding state land to gather firewood, set traplines, hunt and fish. Besides threatening their lifestyle, local residents argued that the area is not suited for commercial farms due to steep slopes, drainage problems and poor soils.

In response, DNR made several changes in its disposal plan, including a reduction in the amount of land to be offered from 7,000 acres to approximately 4,500 acres. In February 1983 DNR issued a written finding, pursuant to former AS 38.05.-035(a)(14),[1] that the Chase III commercial agriculture disposal was in the state's best interests. However, the Commissioner of DNR subsequently "postponed" the scheduled April land sale in response to local opposition.

The commercial disposal was never implemented. Instead, in late 1983 DNR revised the disposal to meet the objectives of a newly enacted homestead program. Alaska Statute 38.09, enacted in 1983, authorizes the disposal of smaller, noncommercial agricultural homesteads to applicants who agree to meet certain requirements. DNR's new plan called for disposal of about 6,000 acres in parcels ranging from 40 to 160 acres each. The plan focused on subsistence-type farming rather than commercial agriculture development.

DNR published a legal notice stating that a written best interests finding had been made regarding the agricultural homestead disposal, and a public meeting was scheduled for January 27, 1984. In a January 13 letter to DNR, Judy Price, one of the appellants here, requested a copy of the finding. She did not receive a copy by

mail nor was the finding made available to her or other people when they attended the meeting.

During the meeting local residents questioned why DNR was proceeding with the Chase disposal prior to completion of the Susitna Area Plan, a statutorily mandated land use plan for the region. They also reiterated concerns raised regarding the commercial disposal, including their view that the area is not suitable for farm development. Following the meeting DNR officials took a brief field trip to the Chase area and subsequently made several changes to the site plan. The final version called for a smaller disposal of 3,530 acres and a reduction in the number of parcels to thirty-two, with four more scheduled for a later offering.

In April 1984 the director of DNR's Division of Forest, Land and Water Management signed an amendment to the previous best interests finding for the commercial disposal. The amendment concluded that the revised agricultural homestead disposal was in the state's best interests. DNR issued an order classifying 1,286 acres of Chase-area land for agricultural use. Other Chase lands had been classified in 1980. A September 14 lottery was scheduled.

Several individuals and an organization of local residents known as Alaska Survival appealed the director's best interests determination to the Commissioner of DNR. DNR held a hearing at the appellants' request and the Commissioner subsequently affirmed the director's decision to proceed with the agricultural homestead disposal.

In mid-August, less than a month before the scheduled lottery, DNR received new information that the soils in the Chase area were of poorer quality than initial surveys indicated. Throughout its planning process DNR had relied on soils information provided by the United States Soil Conservation Service (SCS), based on a preliminary 1980 SCS soils survey. This survey showed that

---

**1.** The language in former AS 38.05.035(a)(14) now appears in AS 38.05.035(e). *See infra* note 5.

88.7 percent of the acreage ultimately included in the homestead disposal contained class II or III soils.[2] In March 1984 DNR requested SCS to update its survey. The revised data showed that none of the thirty-two parcels contained class I or II soils and that twelve of the parcels contained little or no class III soils. Overall, the disposal area contains predominantly class IV or worse soils.[3]

Some DNR officials were concerned that the new data represented a major deviation from the soils information upon which the Chase disposal was premised. When the director of DNR's Division of Agriculture received preliminary word of the new data he wrote the SCS requesting a report as soon as possible. His letter stated: "We have been informed ... that some of the parcels in the Chase III agricultural homestead area may not have any class II or III soils. The political and public policy problems associated with offering [such] land for agricultural homesteading ... are obvious."

After receiving the SCS report, DNR officials met to consider the new information and decided to proceed with the disposal without any changes. The lottery was held and DNR notified the winners that the soils information in the State Land Disposal Brochure had been revised.

A week before the lottery, Alaska Survival and four individuals (hereafter referred to collectively as Alaska Survival) filed a complaint in superior court appealing from the Commissioner's decision and seeking injunctive relief to halt the lottery.[4] The trial court denied a temporary restraining order and allowed the lottery to proceed after the state agreed to delay staking of the land pending a decision on the merits of the suit. The trial court subsequently affirmed DNR's decision to offer Chase land for agricultural homesteading, and awarded the state $10,420 in attorney's fees. The court issued a stay closing the area to entry by the lottery winners pending this appeal.

## II. DISCUSSION

Alaska Survival appeals the decision upholding the Chase III disposal and the award of attorney's fees. Appellant challenges the disposal on both substantive and procedural grounds, arguing 1) that the disposal is not in the state's best interests, and 2) that DNR did not follow the land use planning and decision-making process mandated by statute.

### A. The Best Interests Determination

Alaska's Constitution and the Alaska Land Act, AS 38.05, express a policy of encouraging settlement of the state's lands "by making them available for maximum use consistent with the public interest." Alaska Const. art. VIII, § 1; AS 38.05.910. Alaska Statute 38.05.035(e) authorizes the director of DNR's Division of Lands, acting with the consent of the Commissioner, to dispose of state land upon making a "written finding that the interests of the state will be best served."[5] Alaska Survival contends the Chase agricultural homestead disposal is unlawful because it is not in the state's best interests.

■ In reviewing DNR's substantive decision to dispose of Chase-area land, we apply the "reasonable basis" standard of

---

**2.** The SCS classification system takes into account soils and climatic conditions. Class I through IV soils are generally suitable for cultivation, although the recommended use in Alaska of class IV soils with steep slopes is hay cultivation and grazing; classes V through VII are suitable only for grazing.

**3.** The new data was due in part to a 1983 revision of SCS guidelines for Alaska and also to inaccurate mapping that underestimated slope steepness, erosion potential and wetness conditions.

**4.** The suit named as defendants the Department of Natural Resources, DNR Commissioner Esther C. Wunnicke, and Thomas Hawkins, director of DNR's Division of Forest, Land and Water Management.

**5.** The best interests finding requirement formerly appeared in AS 38.05.035(a)(14). That section was repealed in 1984 and substantially the same language placed in AS 38.05.035(e). See ch. 152, §§ 20, 88, SLA 1984.

review. This limited review is appropriate when a court considers "an administrative agency's decision where questions of fact and law involve agency expertise and/or broad policy considerations." *State v. Weidner,* 684 P.2d 103, 108 n. 4 (Alaska 1984) (citations omitted). Here, the decision to dispose of agricultural homesteads involves both policy considerations and agency expertise on a matter committed to DNR's discretion. We thus confine our review to determining "whether the decision was arbitrary, unreasonable or an abuse of discretion." *North Slope Borough v. LeResche,* 581 P.2d 1112, 1115 (Alaska 1978) (footnote omitted).

■ Alaska Survival first argues that DNR's disposal decision was arbitrary because the agency failed to adequately consider the potential effects on area water quality. However, the record shows that DNR officials specifically considered water quality when they designed the site plan and when they later decided to reduce parcel sizes. DNR also considered a Department of Environmental Conservation study concerning the effects of agricultural development on water quality as well as input from local residents offered during the numerous public hearings held to discuss plans for a Chase disposal. DNR concluded that water quality could be protected by retaining "buffer zones" of state land along streams and by requiring farmers to file and secure DNR approval of homestead conservation plans showing the location of proposed clearing and groundbreaking. *See* 11 AAC 67.155.

Based on this record we conclude that DNR did not act arbitrarily in determining water quality would be adequately protected.

■ We next address appellant's contention that the disposal violates the intent of the Homestead Act, AS 38.09, and contravenes the constitutional mandate that state land be developed "consistent with the public interest," Alaska Const. art. VIII, § 1.

Alaska Survival asserts that because the disposal involves land with "severely limited agricultural uses," the resulting homesteads will not be economically feasible and clearing requirements will be minimal. In appellant's view, the transfer of such land for "free" constitutes an illegal waste of state resources.

Alaska Survival is correct that the disposal of parcels with little or no class II or III soils will result in minimal clearing requirements. *See* AS 38.09.050(a)(5).[6] However, this does not violate any statutory requirement and DNR could reasonably conclude that such a disposal also does not constitute a waste of state resources. First, even where clearing requirements are minimal, a homesteader still must mark the boundaries and survey the land, build a permanent dwelling and reside there. AS 38.09.050(a). Second, there is no statutory requirement for actual cultivation or harvesting, regardless of the soil quality. The legislature apparently recognized that agricultural homesteads might be located in marginal areas. In fact, the legislature in 1984 amended AS 38.09.050(a)(5) to reduce the clearing requirement on parcels with poor-quality soil. Ch. 152, § 53, SLA 1984. We therefore reject appellant's claim that the Chase disposal will result in a waste of public resources.

We turn now to Alaska Survival's argument that it was unreasonable and arbitrary for DNR to proceed with the lottery after learning that the soils data used to plan the disposal was seriously inaccurate. DNR had based both the original commercial agriculture proposal and the revised homestead proposal on the premise that the land contained predominantly class II and III soils, and therefore was suitable for farming. These soil classifications were specifically noted in the best interests finding. The new information received shortly before the scheduled lottery showed that the disposal area contained predominantly class IV or worse soils, which are generally

---

6. AS 38.09.050(a)(5) requires a homesteader to clear and either put into production or prepare for cultivation "25 percent of the land classified for agricultural use or 50 percent of the land having Class II or III soils, *whichever is less.*" (Emphasis added.)

suitable only for grazing and, in some cases, growing hay.

This new information obviously was significant: a special meeting of division directors was called to discuss the soils data and decide whether to alter the planned disposal. Alaska Survival asserts that the decision by DNR officials to proceed with the disposal was improper and that DNR should have postponed the lottery, sought additional public comment and seriously evaluated the new soils information, particularly the effect grazing might have on water quality and area wildlife. If the agency then decided to proceed, Alaska Survival contends DNR should have issued an amended best interests finding.

■ There is no explicit statutory requirement for an amended finding and/or additional public comment upon the discovery of new information. However, an agency's failure to consider an important factor will render its decision arbitrary. *Southeast Alaska Conservation Council, Inc. v. State*, 665 P.2d 544, 548–49 (Alaska 1983). Our role is to ensure that the agency has "taken a *'hard look'* at the salient problems" and has "genuinely engaged in reasoned decision making." *Id.* at 549 (quoting Leventhal, *Environmental Decision Making and the Role of the Courts*, 122 U.Pa.L.Rev. 509, 511) (emphasis in original). We have recognized that complete and accurate information is not a prerequisite for all disposal decisions. For example, in *Hammond v. North Slope Borough*, 645 P.2d 750 (Alaska 1982), we upheld the Commissioner of DNR's decision that the sale of oil and gas leases in the Beaufort Sea was in the state's best interests, despite some uncertainty about the impact on the subsistence lifestyle of the Inupiat Eskimos. *Id.* at 759–61.

Similarly, the federal courts, in construing the National Environmental Policy Act, have held that an agency has a continuing duty to gather and evaluate new information, but that a supplemental environmental impact statement (EIS) is not always required when new information becomes available. *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1023–24 (9th Cir.1980). The test is whether the agency evaluated the information and made a "reasoned determination" not to re-open the review process. *Id.* at 1024.

A question similar to the one before us was raised in *State of California v. Watt*, 683 F.2d 1253 (9th Cir.1982), *rev'd on other grounds sub nom. Secretary of Interior v. California*, 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). There, plaintiffs sought to enjoin a federal off-shore lease sale on the grounds that revised estimates of oil and gas reserves in the lease area required supplementation of the EIS. The new data showed twice the reserves as originally estimated. *Id.* at 1267. The court upheld the decision to proceed without supplementation after concluding that the Department of Interior had "carefully considered" and made public the new data. *Id.* at 1268.

■ Here, DNR division directors met to evaluate the new soils information and consider whether to proceed with the disposal. The director of the Division of Lands prepared a Decision Memorandum which analyzed the soils data and its effect on the Chase project. He concluded that while some of the disposal area was not suitable for traditional cultivation as originally planned, the land still was suitable for grazing and other "less intensive agricultural uses." The memorandum recommended that no changes be made in the disposal plan. The directors unanimously decided to go ahead with the lottery—then scheduled for two weeks away—and both deputy commissioners and a special assistant to the Commissioner concurred. Following the lottery, DNR informed the winners of the new soils data.

■ Given these facts, we are not prepared to say that DNR acted arbitrarily or unreasonably, although we consider it a very close question whether DNR gave the new soils information the kind of scrutiny necessary. Agency officials clearly considered the new soils information, then decided to proceed because, in their view, the

project still contained enough land suitable for agricultural homesteads. The question whether land is suitable for such a purpose and whether the public interest is best served by such a disposal falls directly within the agency's area of expertise. We will not substitute our judgment. *Hammond v. North Slope Borough,* 645 P.2d at 758–59. We note, however, that it would have been preferable for DNR to have made public the new soils information prior to the lottery, and to have more extensively analyzed the information and its impact on the planned disposal.

In summary, we hold that there was a reasonable basis for DNR's finding that the Chase agricultural homestead disposal would be in the state's best interests, and that DNR's subsequent decision to proceed with the lottery after considering the revised soils data was not arbitrary.

### B. *Procedural Violations*

■ We next address whether DNR's disposal decision was invalid due to procedural violations. To resolve this issue we must interpret certain statutes that govern the state's land planning and disposal process. Because interpretation of these statutes does not require the special expertise of the agency, we exercise our independent judgment to determine whether DNR complied with the statutory requirements in deciding to dispose of Chase III land. *Moore v. State,* 553 P.2d 8, 26, 33 (Alaska 1976); *State v. Aleut Corp.,* 541 P.2d 730, 736 (Alaska 1975).

Alaska Survival asserts that DNR violated AS 38.04.065 by classifying Chase land for agricultural use before developing a regional land use plan. DNR adopted the Susitna Area Plan, a comprehensive regional plan that includes the Chase area, in

April 1985, seven months after the lottery. Land included in the lottery was classified in two orders signed in 1980 and 1984. The first order is not challenged since it occurred while a statutory exception was in effect allowing land classification prior to regional planning.[7] However, Alaska Survival contends that the 1984 order, which classified 1,287 acres in the Chase area including 907 acres in the Chase III project,[8] violated AS 38.04.065. The statute provides in relevant part:

Land use planning and classification. (a) The commissioner shall, with local governmental and public involvement in accordance with AS 38.05.945, develop, maintain and, when appropriate, revise land use plans which provide, by regions or areas, for the use of the state-owned land.

. . . .

(c) As a basis for more detailed land use planning and classification, the commissioner shall develop regional land use plans for the use of all state land. These regional plans shall identify and delineate

(1) areas of settlement and settlement impact, where land must be classified for various private uses and for public recreation, open space, and other public uses desirable in and around settlement; and

(2) areas which must be retained in state ownership and planned and classified for various uses and purposes in accordance with AS 38.04.015.

(d) Official regional or area plans and subsequent amendments adopted by the commissioner after public and local governmental participation shall be signed and dated by the commissioner. After adoption of an official regional or area plan, land classifications shall be made in accordance with these official plans.

---

7. Former AS 38.05.047(a)(5)(C) was enacted by ch. 85, § 13, SLA 1979, and repealed by ch. 113, § 45, SLA 1981. It directed the commissioner of DNR, "[n]otwithstanding the provisions of AS 38.04," to classify, before September 1, 1980, all state lands in municipalities determined to be best suited for disposal for agricultural use. *See State v. Weidner,* 684 P.2d 103, 107 (Alaska 1984).

8. The state asserts that the 1984 classification order affected only 280 acres in the Chase III disposal. However, our reading of the record indicates that 907 acres in the Chase project were covered by the 1984 classification, including 347 acres in the lottery disposal and 560 acres scheduled for a second phase offering.

We discussed this statute in *State v. Weidner*, 684 P.2d 103 (Alaska 1984), and concluded that AS 38.04.065(d) "generally requires the development of [land] use plans before classification" of state lands. *Id.* at 107. We did not elaborate on this requirement because the land involved in *Weidner* was covered by a specific statutory exception, repealed in 1981, permitting classification prior to planning. *Id.* As explained below, however, the interpretation stated in *Weidner* is consistent with constitutional mandates and the legislature's overall approach to the management of state lands.

The framers of the Alaska Constitution placed a high value on the state's land resources. *Moore v. State*, 553 P.2d at 30. Article VIII, section 10 of the constitution provides: "No disposals or leases of state lands, or interests therein, shall be made without prior public notice and other safeguards of the public interest as may be prescribed by law."

In accordance with this provision, the first Alaska legislature enacted the Alaska Land Act, AS 38.05, to establish procedural safeguards for the management and disposal of state lands and the natural resources they contain. The legislature later added AS 38.04, setting forth state policy for the use and classification of state lands. Alaska Statute 38.04.005(a) provides:

> In order to provide for maximum use of state land consistent with the public interest, it is the policy of the State of Alaska to plan and manage state-owned land to establish a balanced combination of land available for both public and private purposes. *The choice of land best suited for public and private use shall be determined through the inventory, planning, and classification processes set out in AS 38.04.060–38.04.070.*

(Emphasis added.) These referenced statutes require 1) an inventory of all state lands, 2) the preparation of regional land use plans based on consideration of a wide range of factors, and 3) the classification of state lands.

■ In our view, both the organization of the statutory scheme and the particular language of AS 38.04.065(c) and (d) express an unambiguous intent that regional planning precede land classifications and disposals. Subsection .065(c) specifically directs DNR to develop regional land use plans "[a]s a basis for more detailed land use planning and classification." Subsection .065(d) provides, in part: "After adoption of an official regional or area plan, land classifications shall be made in accordance with these official plans." To interpret these provisions to allow classification and disposal before regional planning defies logic. It makes little sense to require comprehensive regional planning after the relevant land use decisions already have been made, especially irrevocable disposal decisions.

DNR, however, suggests a different interpretation of AS 38.04.065(d). DNR contends the planning requirement may be met by a site-specific "land planning report" prepared in advance of a comprehensive regional land use plan. This interpretation is reflected in a regulation adopted by the department. *See* 11 AAC 55.030 (eff. Nov. 12, 1978; am Sept. 7, 1983). It permits classification of land based on a "brief, site-specific planning document prepared in the absence of an area or management plan" as long as the document considers certain factors identified in the statutory provision. 11 AAC 55.030(e). Relying on this regulation, DNR adopted a site-specific "land planning report" covering the 1,287 Chase acres included in the 1984 classification order.

■ We cannot accept the argument that this regulation properly implements AS 38.04.065. DNR is correct that the statute does not define "regions or areas" when it directs DNR to "develop ... land use plans which provide, by regions or areas, for the use of the state-owned land." AS 38.04.065(a). When read in its entirety, however, the statute's meaning is plain: it mandates a comprehensive, broad-scale planning process prior to site-specific planning and classification. For example, sub-

section .065(c) specifies that regional land use plans be developed "[a]s a basis for more detailed land use planning and classification." DNR may be correct that the statute does not require plans on the scale of the Susitna Area Plan, which covers 15.8 million acres. However, it would be difficult to use a planning report covering only 1,287 acres as the basis for more detailed land use planning. We conclude that a regulation which permits land classification based on a planning document covering only 1,287 acres is inconsistent with the statutory scheme.

DNR argues that this interpretation is incorrect because the legislature did not intend, by enacting AS 38.04.065, to halt all state land disposals pending completion of regional plans. We agree that when the statute was enacted in 1978 as part of a land planning and disposal bill the legislature expressed its intent to accelerate the disposal of state lands.[9] However, the legislature recognized that in order to assure some immediate disposals it would need to *temporarily* relax the statutory planning requirements. Thus, the legislature enacted former AS 38.05.047(a)(5)(C)[10] to permit, for a limited time period, the classification of agricultural land without meeting the planning requirements of AS 38.04.065. If the legislature did not intend AS 38.04.065 to bar classifications in the absence of regional land use plans, this temporary statutory exception would have been unnecessary. The repeal of the exception in 1981 further indicates that the legislature intended future classifications to be based on regional plans.

For these reasons, we conclude that AS 38.04.065 requires regional planning to precede land classification, and that a regulation which permits classification based on a site-specific plan covering only 1,287 acres contravenes the language and intent of the statute. DNR's 1984 classification of Chase lands was therefore improper.

The next question is whether DNR's failure to engage in proper planning requires invalidation of the Chase disposal. DNR argues that since the regional plan is now complete and designates the Chase III area for agricultural homesteading, any planning violation is moot. In deciding this question we must consider whether DNR would have made the same decision concerning the Chase disposal if the agency had first developed a regional plan as required by AS 38.04.065. In other words, did the procedural violation have any real impact on DNR's substantive decision to proceed with the homestead disposal? For the reasons discussed below, we conclude that it did. We therefore reject DNR's mootness argument.

First, the record supports Alaska Survival's contention that the Susitna Area Plan (SAP) simply ratified, without comprehensive analysis, DNR's earlier decision to dispose of Chase agricultural land, and that the planners failed to address certain issues because of this litigation. In a document containing public comments on the draft plan and responses by DNR, several persons criticized the SAP's handling of the Chase area and claimed that the plan contained some factual errors. DNR responded: "The Chase III agricultural homestead disposal is presently the subject of a lawsuit by Alaska Survival. The issues raised above cannot be resolved until the outcome of the litigation is known...."[11]

We also note that the SAP's designation of the 3,530–acre Chase III area for agricultural homesteading appears inconsistent

---

9. For example, one section of the bill required DNR to make available for disposal a minimum of 50,000 acres in 1979 and to propose similar disposals in subsequent years. Ch. 181, § 5, SLA 1978. That section, in former AS 38.04.020, has since been repealed.

10. *See supra* note 7.

11. The response document also contained a citizen's suggestion that the Chase management unit receive a detailed management plan. DNR responded: "the plan will recommend a management plan be done ... if it is determined that lots of important land use decisions remain to be made. This would be the case if, as a result of litigation on the Chase III ag [agricultural] homestead area, the project is halted entirely."

with the plan's statement of overall management guidelines for agricultural lands. The guidelines state that blocks of 2,000 acres or more of agricultural lands "should be used primarily to support commercial farming under the state's standard agricultural land disposal (*rather than under the homestead program....*)" (Emphasis added.) The guidelines further state that "[s]cattered, smaller parcels" should be considered for the agricultural homestead program. This inconsistency is a further indication that the plan simply ratified DNR's earlier decision to dispose of Chase lands as agricultural homesteads.

DNR's mootness argument also is invalid for a second reason. We are persuaded that the disclosure and public discussion of certain information in the SAP would have prompted closer consideration of alternative disposal areas. According to the SAP, the planning area includes approximately 400,000 acres of publicly owned cultivable soils in contiguous blocks large enough to support farming. Of these lands, the SAP identifies 26,120 acres in the planning region which are currently scheduled for state disposals. The Chase III land thus represents less than one-seventh of the state land in the region identified for agricultural disposal. If this information had been available prior to the Chase III classification and disposal, local residents (or even DNR planners) could have suggested alternative disposals with potentially less impact on area resources. Also, had the plan been completed and made public when the error regarding the quality of Chase soils was discovered, it may have spurred reconsideration to determine if one of the other areas identified for disposals would be better suited for agricultural homesteads.

In short, we believe that DNR's failure to develop a regional plan before classifying and disposing of the Chase III land was a serious procedural violation that may well have affected the agency's disposal decision. We also note that the state's mootness argument ignores one of the purposes of a regional planning process—to allow for "meaningful participation" by local governments, state and federal agencies, adjacent landowners and the general public. AS 38.04.065(b)(8); *see also* AS 38.-04.065(a) and (b)(2). Meaningful participation is thwarted where citizens lack key factual information, such as information in this case regarding other areas within the planning region specifically identified for agricultural disposals.

For these reasons, we conclude that DNR's adoption of a regional plan seven months after the Chase lottery did not cure the agency's prior violation of statutory planning requirements. We therefore hold that the Chase III disposal is invalid. We remand DNR's disposal decision to the agency for further consideration and public comment in view of the regional plan and any revisions deemed necessary to the plan.

Because we hold the disposal invalid due to the planning violation, we need not decide Alaska Survival's claim that a written finding that the homestead disposal was in the state's best interests was not timely made or provided to appellants upon request, as required by AS 38.05.035(e). On remand, when DNR reconsiders its decision in view of the SAP, the agency will have to make a new best interests finding if it decides to proceed with a disposal. If that occurs, DNR will be required to publicize the finding and provide an opportunity for meaningful public comment.[12]

---

12. Alaska Survival also contends that DNR violated statutory procedural requirements, *see* AS 38.04.020(j), in handling a nomination made by one of the individual appellants, Judy Price, to remove 35,000 acres of Chase-area land from the state's land disposal bank. This issue is not properly before us. DNR notified Price in January 1984 of the Commissioner's decision not to reclassify the nominated land as requested. Under Alaska Appellate Rule 602(a)(2) Price had 30 days to appeal the Commissioner's decision to the superior court. No filing occurred until September 1984, when appellants sued to challenge DNR's disposal decision and included the land bank nomination among several claims of error. We therefore decline to consider this issue. *See Ballard v. Stich,* 628 P.2d 918, 920 (Alaska 1981).

## C. *Attorney's Fees*

■ Alaska Survival and the individual appellants contend the trial court erred when it denied their status as public interest plaintiffs and ordered them to pay $10,420 in attorney's fees.[13] Because of our holding on the merits of this appeal, the state no longer is entitled to fees as the prevailing party. However, Alaska Survival's claimed status must still be examined since a prevailing public interest litigant is generally entitled to full reasonable attorney's fees rather than partial fees. *Hunsicker v. Thompson*, 717 P.2d 358, 359 (Alaska 1986).

In *Oceanview Homeowners Association, Inc. v. Quadrant Construction and Engineering*, we reiterated the four criteria for identifying public interest suits:

(1) whether the case is designed to effectuate strong public policies; (2) whether, if the plaintiff succeeds, numerous people will benefit from the lawsuit; (3) whether only a private party could be expected to bring the suit; and (4) whether the litigant claiming public interest status would lack sufficient economic incentive to bring the lawsuit if it did not involve issues of general importance.

680 P.2d 793, 799 (Alaska 1984) (citing *Kenai Lumber Co. v. LeResche*, 646 P.2d 215, 222–23 (Alaska 1982)).

The state does not dispute that this litigation satisfies the first three criteria. The state contends, however, that the appellants do not qualify as public interest litigants because they had a strong economic incentive to bring this lawsuit whether or not it involved issues of public importance. The state notes that appellants argued to DNR and the trial court that they are economically dependent on use of the land in the disposal area to gather firewood and house-building logs, and to hunt and fish for food. We conclude, however, that a more substantial financial interest is required before a litigant will be deemed to have an independent economic incentive to bring suit.[14]

In two analogous cases we recognized the public interest status of residents who challenged zoning decisions affecting their neighborhoods. The first case, *Anchorage v. McCabe*, 568 P.2d at 989–91, involved two homeowners who challenged the constitutionality of an ordinance and a city council decision permitting construction of two high-rises in their neighborhood. The second case, *Oceanview Homeowners Association*, 680 P.2d at 795, involved a group of homeowners who sued unsuccessfully to overturn a zoning board decision allowing continued use of a private airstrip near their homes. In concluding that the *Oceanview* plaintiffs were public interest litigants, we noted they had consistently emphasized health and safety rather than economic concerns. *Id.* at 799.

■ Here, no argument was made that the Chase disposal would result in economic injury by causing property values to decline. Instead, appellants emphasized concerns about contamination of water supplies, impact on area wildlife and the general effect that increased settlement would have on the quality of their subsistence lifestyle. While appellants stressed their dependency upon the use of state land in the disposal area for hunting, fishing, and wood gathering, they relied on these resources for personal rather than commercial purposes. This is not the type of substantial economic interest sufficient to bar a litigant from qualifying as a public interest plaintiff.

The superior court judgment is REVERSED and DNR's disposal decision is REMANDED to the agency for further consideration. The court is directed to rec-

---

13. Although the trial court apparently did not make a specific finding on the issue, implicit in the court's award of fees against Alaska Survival is the finding that this is not public interest litigation.

14. *See, e.g., Kenai Lumber Co. v. LeResche*, 646 P.2d 215, 223 (Alaska 1982) (competing lumber company seeking commercially valuable timber denied public interest status); *Mobil Oil Corp. v. Local Boundary Comm'n*, 518 P.2d 92, 104 (Alaska 1974) (denial of public interest status proper where large sums at stake).

ognize appellants' public interest status and award attorney's fees accordingly.