**LABORERS LOCAL # 942, Appellant,**

**v.**

**Deborah LAMPKIN, Cole Lusk, Karl Hnilika, Daniel McGrath, Kris Strayer, Cody Engle, Ronald Ashcraft, Melvin Lindquist, Bruce Pardy, Dick Eickman, Jeffrey J. Bouton, Ellis M. Chapman, Dwight C. Hjorth, Raymond L. Hobson, David Johnson, Darrin C. Koloski, Brian Luoma, John J. Matykowski, Michael K. Nichols, Matt Seekatz, Eric A. Stewart, Scott Walker, Scott Watson, Gordon L. Windburn, Andrew J. Workman, Anthony H. Fazio, Brett A. McLean, Chris H. Sharpe, David D. Stewart, Jason Chalstrom, Jeffrey E. Hatt, John Blankenship II, Martin M. Snavely, Richard W.**

Pace, Steve W. Eldridge, Tim Beckley, William L. Slayden, Scott D. Anderson, David Corbin, Jerry Winkelman, Todd Bary, Joseph Voorhees, Richard L. Engebretson, Edward J. Mayer, Roger Stone, Vincent Groff, Martin Theis, Dwane A. Viers, Mark A. Long, Glenn Rush, Rod Nissen, Richard Ham, Roger K. Marshall, Scott A. Sluka, John Nau, Shawn Orourke, Arthur A. Armstrong, David Armstrong, Donald Culver, John Janssen, Thomas Hawkins, Gregory Bish, Eldon Wartes, Mark Wartes, J.F. (Stoney) Stolberg, Osborne Construction Co., Samson Electric, Inc., Slayden Plumbing & Heating, Inc., and Voorhees Concrete Cutting Specialists, Inc., Appellees.

### FAIRBANKS BUILDING AND CONSTRUCTION TRADES COUNCIL, AFL–CIO, Appellant,

v.

Deborah LAMPKIN, Cole Lusk, Karl Hnilika, Daniel McGrath, Kris Strayer, Cody Engle, Ronald Ashcraft, Melvin Lindquist, Bruce Pardy, Dick Eickman, Jeffrey J. Bouton, Ellis M. Chapman, Dwight C. Hjorth, Raymond L. Hobson, David Johnson, Darrin C. Koloski, Brian Luoma, John J. Matykowski, Michael K. Nichols, Matt Seekatz, Eric A. Stewart, Scott Walker, Scott Watson, Gordon L. Windburn, Andrew J. Workman, Anthony H. Fazio, Brett A. McLean, Chris H. Sharpe, David D. Stewart, Jason Chalstrom, Jeffrey E. Hatt, John Blankenship II, Martin M. Snavely, Richard W. Pace, Steve W. Eldridge, Tim Beckley, William L. Slayden, Scott D. Anderson, David Corbin, Jerry Winkelman, Todd Bary, Joseph Voorhees, Richard L. Engebretson, Edward J. Mayer, Roger Stone, Vincent Groff, Martin Theis, Dwane A. Viers, Mark A. Long, Glenn Rush, Rod Nissen, Richard Ham, Roger K. Marshall, Scott A. Sluka, John Nau, Shawn Orourke, Arthur A. Armstrong, David Armstrong, Donald Culver, John Janssen, Thomas Hawkins, Gregory Bish, Eldon Wartes, Mark Wartes, J.F. (Stoney) Stolberg, Osborne Construction Co., Samson Electric, Inc., Slayden Plumbing & Heating, Inc., and Voorhees Concrete Cutting Specialists, Inc., Appellees.

### FAIRBANKS NORTH STAR BOROUGH, Appellant and Cross–Appellee,

v.

Deborah LAMPKIN, Cole Lusk, Karl Hnilika, Daniel McGrath, Kris Strayer, Cody Engle, Ronald Ashcraft, Melvin Lindquist, Bruce Pardy, Dick Eickman, Jeffrey J. Bouton, Ellis M. Chapman, Dwight C. Hjorth, Raymond L. Hobson, David Johnson, Darrin C. Koloski, Brian Luoma, John J. Matykowski, Michael K. Nichols, Matt Seekatz, Eric A. Stewart, Scott Walker, Scott Watson, Gordon L. Windburn, Andrew J. Workman, Anthony H. Fazio, Brett A. McLean, Chris H. Sharpe, David D. Stewart, Jason Chalstrom, Jeffrey E. Hatt, John Blankenship II, Martin M. Snavely, Richard W. Pace, Steve W. Eldridge, Tim Beckley, William L. Slayden, Scott D. Anderson, David Corbin, Jerry Winkelman, Todd Bary, Joseph Voorhees, Richard L. Engebretson, Edward J. Mayer, Roger Stone, Vincent Groff, Martin Theis, Dwane A. Viers, Mark A. Long, Glenn Rush, Rod Nissen, Richard Ham, Roger K. Marshall, Scott A. Sluka, John Nau, Shawn Orourke, Arthur A. Armstrong, David Armstrong, Donald Culver, John Janssen, Thomas Hawkins, Gregory Bish, Eldon Wartes, Mark Wartes, J.F. (Stoney) Stolberg, Osborne Construction Co., Samson Electric, Inc., Slayden Plumbing & Heating, Inc., and Voorhees Concrete Cutting Specialists, Inc., Appellees and Cross–Appellants.

Nos. S–7651, S–7662, S–7765 and S–7775.

Supreme Court of Alaska.

March 20, 1998.

Rehearing Denied April 13, 1998.

Kevin Dougherty, Anchorage, for Appellant Laborers Local # 942 and Appellant Fairbanks Building and Construction Trades Council, AFL–CIO.

Ardith Lynch, Borough Attorney, and A. Rene Broker, Assistant Borough Attorney, Fairbanks, and Robert B. Groseclose, Cook, Schuhmann & Groseclose, Fairbanks, for Appellant/Cross–Appellee Fairbanks North Star Borough.

Donna C. Willard, Law Offices of Donna C. Willard, Anchorage, for Appellees/Cross–Appellants Deborah Lampkin et al.

Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE and BRYNER, JJ.

## OPINION

FABE, Justice.

### I. *INTRODUCTION*

These consolidated appeals raise the issue of whether the Fairbanks North Star Borough's decision to require successful bidders on a construction project to enter into a project labor agreement with local labor unions violated the Alaska Constitution and the borough's procurement code. The superior court struck one provision of the agreement and enjoined enforcement of another under the state constitution, but upheld the remainder. We affirm in part and reverse in part, holding that no portion of the agreement violates the state constitution or the borough's procurement code.

## II. FACTS AND PROCEEDINGS

In 1993 the Fairbanks North Star Borough (Borough) decided to renovate Lathrop High School (Lathrop High Project). The $20 million project in downtown Fairbanks, funded in part by an $8.6 million bond issue approved by Borough voters and in part by grants from the state, was the largest construction project ever undertaken by the Borough. The schedule for the project required that contractors complete a certain amount of work by the end of the summer of 1996, continue work during the school year without disrupting classes for about 1,400 students, and complete the project in the summer of 1997.

■ Before starting the bidding process, the Borough mayor, James Sampson, approached the Fairbanks Building and Construction Trades Council (Trades Council), an organization representing fourteen local craft unions, to investigate the possibility of a project labor agreement[1] (PLA) for the Lathrop High Project and another school project. After negotiations, the mayor and the Trades Council produced a PLA to be entered into by the unions and the successful bidders on the project. The Borough Assembly approved a resolution to "support[ ] the Borough Mayor in his use of a project labor agreement on [the] Lathrop High [Project],"[2] and the mayor issued an "Executive

---

**1.** A project labor agreement is
> a prebid contract between a construction project owner and a labor union (or unions) establishing the union as the collective bargaining representative for all persons who will perform work on the project. The PLA provides that only contractors and subcontractors who sign a prenegotiated agreement with the union can perform project work. A PLA thus generally requires all bidders on the project to hire workers through the union hiring halls; follow specified dispute resolution procedures; comply with union wage, benefit, seniority, apprenticeship and other rules; and contribute to the union benefit funds. In return for a project owner's promise to insist in its specifications that all successful bidders agree to be covered by a PLA, the union promises labor peace through the life of the contract.

*New York State Chapter, Inc. v. New York State Thruway Auth.*, 88 N.Y.2d 56, 643 N.Y.S.2d 480, 483, 666 N.E.2d 185, 188 (1996).
> Project labor agreements originated in the construction industry
> to accommodate conditions specific to that industry. Such conditions include, among others, the short-term nature of employment which makes posthire collective bargaining difficult, the contractor's need for predictable costs and a steady supply of skilled labor, and a longstanding custom of prehire bargaining in the industry.

*Building & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 231, 113 S.Ct. 1190, 1198, 122 L.Ed.2d 565 (1993).

**2.** The resolution states:
> WHEREAS, the Fairbanks North Star Borough finds that project labor agreements for major public and private construction projects have proven to be of economic benefit to their owners, including state and local governments, project labor agreements facilitate the timely and efficient completion of major construction projects, they allow for the negotiation of any specialized terms and conditions unique to the

> projects and provide the owner with a legally enforceable means of assuring labor stability over the life of the projects; and
> WHEREAS, the use of project labor agreements for major public school construction, renovation, alteration and repair projects, particularly those projects which extend over a period of time, involve a substantial number of contractors and subcontractors and/or require a substantial number of experienced, skilled trades and craft workers and on projects with a substantial dollar value are in the overall best interests of the Fairbanks North Star Borough; and
> WHEREAS, the development of a project labor agreement for the major Lathrop High School renovation project and the new Eielson Elementary School is in the best interest of the Fairbanks North Star Borough and the public, in order to meet the construction time schedules for the projects, to ensure that the projects will be completed with qualified Alaskan workers, to ensure that the projects will meet the highest standards of safety and quality, to ensure that there are peaceful, orderly, and mutually binding procedures for resolving labor issues, to avoid labor disputes or conflicts, and to promote overall stability through the duration of the projects, without strikes, lockouts, or slowdowns, all of which allow the borough to more accurately predict and reduce [the] cost of the projects; and
> WHEREAS, the Lathrop High School project must ensure that the school remain in operation during much of the major renovation work and a project labor agreement for the Lathrop High School and the new Eielson Elementary School projects, providing for uniform work rules and conditions for all trades, irregardless of craft, flexibility in scheduling shift work and starting and ending hours, elimination of premium pay, and agreement to freeze wages and fringe benefit contributions for at least two years after commencement of the projects, a guarantee of no strikes during

Order" authorizing the inclusion of the PLA as a bid specification in the Lathrop High Project. The bid specification provided:

> The CONTRACTOR shall sign and comply with all terms and conditions of the Project Labor Agreement. The CONTRACTOR shall sign and return the Project Labor Agreement within ten (10) calendar days after receipt of Notice of Award. CONTRACTOR shall assure that all subcontractors also sign the Project Labor Agreement prior to their employment on the project and comply with all of its terms and conditions for the duration of the project.

Under the PLA, contractors retained their rights to "direct the working force" and control construction but recognized "the Unions as the sole and exclusive bargaining representatives with respect to rates of pay, hours and other conditions of employment." The PLA required the employer to be bound by the "job referral systems" contained in the "master agreements" between the particular unions and union employers (Hiring Hall Provision). The PLA stated that the

> selection of applicants for referral to jobs shall be on a non-discriminatory basis and in accordance with the President's Executive Order 11246 and Title VII of the Civil Rights Act of 1964, as amended, and shall not be based on, or in any way affected by, union membership, or the lack thereof.[3]

The PLA further stated that these "job referral systems must be operated in accordance with federal and state law and the conditions set forth in the [PLA]." The employer retained the right under the PLA and the master agreements to reject any job applicant referred by the union upon "written notification or cause."

Employees under the PLA were required to become members in good standing in the respective Unions within eight (8) days following the beginning of their employment or the effective date of this Agreement, whichever is later. Good standing shall be defined as the tendering of periodic dues and fees as uniformly required by the Unions.

The PLA also established grievance procedures, wages, hours, and working conditions and required employers to "make contributions to the established fringe benefit funds in the amounts designated by the appropriate Local Union" (Fringe Benefits Provision). The PLA eliminated shift differentials, double pay on Sundays, premium pay, and some paid holidays. It also permitted flexible scheduling. Finally, the PLA provided that there would "be no strikes, picketing, work stoppages, slowdowns or other disruptive activity against signatory contractors" during the term of the PLA.

The Borough issued its invitation for bids, including the specification requiring successful bidders to sign the PLA, on March 7, 1996. On April 1, 1996, Deborah Lampkin et al. (collectively, Lampkin), a group of non-union employees, taxpayers, and employers, filed a complaint against the Borough. The complaint alleged that the Borough's inclusion of the PLA bid specification violated the Alaska and United States Constitutions, the Employee Retirement Income Security Act (ERISA), and Borough and state procurement law. Along with the complaint, Lampkin filed a motion for a temporary restraining order and a consolidated trial on the preliminary injunction and the merits.

The superior court scheduled a hearing for April 5, 1996. Before the hearing, the Borough filed a notice of removal to federal court, and Laborers Local 942 and the Trades Council (collectively, Unions) filed motions to intervene. After considering Lampkin's amended complaint eliminating all claims under federal law, the federal district court granted Lampkin's motion to remand to state superior court on April 11, schedul-

---

the duration of the projects and other provisions advantageous to the borough, make it in the Fairbanks North Star Borough's economic and financial interest as the owner to support a project labor agreement.

NOW, THEREFORE, BE IT RESOLVED, that the Fairbanks North Star Borough Assem-

bly supports the Borough Mayor in his use of a project labor agreement on [the] Lathrop High School and the Eielson Elementary School Projects.

**3.** Similar language is included in the master agreements themselves.

ing certification to state court for April 25 so as to retain jurisdiction over the Borough's motion for reconsideration.

Upon oral notification of the remand on April 12, the superior court granted Lampkin's motion for a temporary restraining order and a combined hearing on the preliminary injunction and the merits, setting the hearing for April 17. The Borough objected to the court's decision to grant a trial on the merits with only five days' notice and without giving it a chance to oppose the request. It also objected to Lampkin's failure to join the unions that had signed the PLA.

The federal court denied the Borough's motion for reconsideration and issued an order transferring jurisdiction to the state court on April 16. The state court received this order on the morning of the one-day combined trial and hearing on the preliminary injunction. At the beginning of this proceeding, the Unions notified the trial court of their pending motions to intervene. The superior court denied the motions and proceeded with the trial.

The superior court entered its decision on April 22, 1996, holding that the "restrictive hiring hall" provisions of the PLA "violate[d] the equal protection rights of non-union workers in the construction field." It also ruled that the PLA's requirement that workers contribute "to separate pension funds which contain onerous vesting requirements impermissibly requires the non-union workers to fund programs which are of no benefit to either the Borough or the affected workers." As a remedy, the superior court ordered that the PLA "be modified to clarify the fact that any contractors working on the Lathrop High School Remodeling Project may hire workers from either union or non-union sources" and that the Borough not enforce the portion of the PLA requiring payments into pension programs. The court then concluded that the modified PLA complied with the procurement provisions of state and Borough law.

The Borough moved for reconsideration of the trial court's finding that the state pro-

curement code applied to the project. The trial court issued an order stating that the state procurement code "does not likely cover the Lathrop High School project" but declined to issue final judgment on this issue without "more specific evidence as to exactly what the sources of funds were for the Lathrop project." Finally, the superior court, finding that both parties prevailed on a main issue, denied motions by both parties for attorney's fees and costs.

The Borough appeals the superior court's order striking the Hiring Hall Provision from the PLA. The Unions appeal the superior court's denial of their motion to intervene and the court's order striking the requirement that employers contribute to union pension funds. Lampkin cross-appeals the superior court's ruling that the PLA as modified by the court's order did not violate state or Borough law and the court's denial of her request for attorney's fees.

## III. DISCUSSION

### A. The Borough's Action Did Not Violate the Equal Protection Rights of Non-union Workers.[4]

■ The Borough challenges the superior court's ruling that the PLA violated "the equal protection rights of non-union workers in the construction field." The superior court reasoned that while the Borough had important and legitimate reasons to require the successful bidder to sign the PLA, the "nexus between this requirement and the Borough's important reasons" was not sufficient to justify infringing the right of non-union construction workers "to work in the construction industry."

■ Analysis of claims under the equal protection clause embodied in article 1, section 1 of the Alaska Constitution requires a sliding scale approach that often affords greater protection to individual rights than that provided by the federal constitution. *See State, Dep't of Transp. & Labor v. En-*

---

4. We review the legality of the PLA under the Alaska Constitution using our independent judgment and applying the rule of law most persuasive in light of precedent, policy, and reason. *See Berger v. State, Dep't of Revenue,* 910 P.2d 581, 584 n. 6 (Alaska 1996).

serch Alaska Constr., Inc., 787 P.2d 624, 631 (Alaska 1989). Under this approach,

> we first determine the importance of the individual interest impaired by the challenged enactment. We then examine the importance of the state interest underlying the enactment, that is, the purpose of the enactment. Depending upon the importance of the individual interest, the equal protection clause requires that the state's interest fall somewhere on a continuum from mere legitimacy to a compelling interest. Finally, we examine the nexus between the state interest and the state's means of furthering that interest. Again depending upon the importance of the individual interest, the equal protection clause requires that the nexus fall somewhere on a continuum from substantial relationship to least restrictive means.

Id. at 631–32 (citing Alaska Pac. Assurance Co. v. Brown, 687 P.2d 264, 269–70 (Alaska 1984)). In Enserch, we held that "the right to engage in economic endeavor" is an important right that the government may impair only if its interest in taking the challenged action is important and the nexus between the action and the interest it serves is close.[5] See id. at 633.

■ We are aware of only one published opinion addressing the equal protection implications of a project labor agreement. In that opinion, an Ohio appellate court ruled that a project labor agreement very similar to that at issue here did not discriminate on the basis of union affiliation. See State ex rel. Associated Builders & Contractors, Cent. Ohio Chapter v. Jefferson County Bd. of Comm'rs, 106 Ohio App.3d 176, 665 N.E.2d 723, 726 (1995). However, the superior court found in this case that the "union referral systems which the contractor must use exclusively are most assuredly affected by union membership or the lack thereof."[6] Although the parties discuss at length whether the PLA discriminates against non-union workers, we conclude that we need not address this question. Instead, for the purpose of our analysis, we assume that the PLA impairs the right of non-union workers to engage in an economic endeavor. Therefore, we proceed, as we did in Enserch, to determine whether the Borough's interest in requiring successful bidders to sign the PLA was important and whether the nexus between that interest and the PLA was close.[7]

In his executive order directing the use of the PLA, Mayor Sampson identified several interests that he believed the PLA would advance. These included the benefits to the Borough of being able to "negotiate and secure, prior to the bidding process, meaningful labor concessions." He further relied on the Borough's interest in "ensur[ing] the ready and adequate supply of highly trained and skilled craft workers, labor stability, timely and efficient completion of the project, and uniform grievance procedures."[8] The

---

5. At issue in Enserch was a state law establishing hiring preferences on public works projects for eligible residents of "an economically distressed zone." Enserch, 787 P.2d at 625–26. The state labor commissioner, applying the statutory criteria, declared the Northwest Arctic Borough such a zone and thus required the plaintiff, Enserch Alaska Construction, Inc., to fill at least 50% of the positions available in certain designated crafts on a road project with eligible, qualified residents of the borough. See id. at 627. The company sued, and the superior court held that the preference law violated the equal protection provision of the Alaska Constitution. See id. On appeal, we affirmed the equal protection holding, determining that the law infringed an important right and that the underlying objective of the law, "economically assisting one class over another," was illegitimate. Id. at 633–34. We also noted that the fit between the objective of community aid and the law was not close because the law was "seriously over- and underinclusive." Id. at 634.

6. The superior court based this conclusion on its interpretation of the hiring hall procedures outlined in the general collective bargaining agreements between each union and signatory contractors. These procedures give some categories of registrants priority over others in the referral process. The criterion used to establish these categories is usually the worker's length of employment with the employer or employers party to the agreement or related agreements. Such "book systems" are permitted under federal law. See M.W. Kellogg Constructors, Inc. v. NLRB, 806 F.2d 1435, 1440 (9th Cir.1986) (citing 29 U.S.C. 158(f)).

7. The superior court erroneously required that the PLA be "the least restrictive means of achieving the Borough's legitimate objective."

8. Mayor Sampson also testified at trial, and to the Borough Assembly before it adopted the resolution supporting the use of the PLA, that the PLA would provide economic and other benefits to the Borough.

Borough Assembly also cited these advantages in adopting its resolution supporting the use of the PLA.

We think it clear that the Borough, in undertaking the largest and most complex construction project in its history, a project involving a school with more than 1,400 students located in downtown Fairbanks, had a significant interest in assuring that the project would be completed on schedule and within budget. Indeed, such goals are at the heart of the effective management of a construction project, whether the owner of the project is a private party or a public entity acting in a proprietary capacity. *See Building & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 232, 113 S.Ct. 1190, 1198, 122 L.Ed.2d 565 (1993) (*Boston Harbor*) (noting that the "legitimate" incentives "to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost" are identical whether the project owner is public or private). The Borough's failure to achieve these goals would affect not just the interests of one narrow portion of the Borough but would harm all residents, especially students at the high school and Borough taxpayers. Therefore, we agree with the superior court that the Borough's interests in using the PLA were "important" for the purpose of equal protection analysis.

Furthermore, we conclude that the nexus between those interests and the challenged PLA satisfies the demands of equal protection. First, the terms of the PLA demonstrate its close relationship to the special requirements of the Lathrop High Project, especially the need to perform construction with as little disruption of classes as possible. The PLA standardized and reduced the number of holidays, allowed for flexible work weeks and starting times, and assured that the project would not be slowed or halted by strikes or other labor disturbances. It lowered the cost of the project's tight scheduling requirements by eliminating travel pay, shift differentials, weekend overtime pay, paid holidays, and premium pay for special duties.

Finally, as the superior court noted, the PLA promoted labor stability and implemented uniform grievance procedures on the large and complex project.[9]

Moreover, the Borough's use of the PLA is supported by a long history of project labor agreements in both public and private construction, including projects such as federal hydroelectric dams and the Trans–Alaska Pipeline. *See* Henry H. Perritt, Jr., *Keeping the Government Out of the Way: Project Labor Agreements Under the Supreme Court's Boston Harbor Decision*, 12 Lab. Law. 69, 69–70 (1996); *see also George Harms Constr. Co. v. New Jersey Turnpike Auth.*, 137 N.J. 8, 644 A.2d 76, 95 (1994) (listing projects using project labor agreements). This history provides compelling evidence of the usefulness of these agreements in achieving the Borough's objectives.

Finally, federal law expressly recognizes the effectiveness of project labor agreements in accomplishing the goals of construction project owners. Congress amended the National Labor Relations Act (NLRA) in 1959 specifically to allow private employers in the construction industry to enter into this type of agreement, including provisions for union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls. *See Boston Harbor*, 507 U.S. at 230, 113 S.Ct. at 1197. The United States Supreme Court, in rejecting a challenge to project labor agreements under the NLRA, has also unanimously endorsed them as an effective tool for public owner-developers in dealing with conditions in the construction industry. *See id.* at 230–33, 113 S.Ct. at 1197–99; *see also George Harms*, 644 A.2d at 95 (noting that project labor agreements "serve important purposes on major long-term construction projects").

Given the relationship between the terms of the PLA and the special requirements of the Lathrop High Project, the established use of project labor agreements in the construction industry, and the express endorse-

---

9. We also note that because application of the challenged PLA is limited to the Lathrop High Project, it does not, unlike the law at issue in *Enserch*, suffer from the defects of under- or overinclusiveness. *See* 787 P.2d at 634–35; *see also Boston Harbor*, 507 U.S. at 232, 113 S.Ct. at 1198 (noting that the PLA at issue "was specifically tailored to one particular job").

ment of these agreements by Congress and the Supreme Court, we determine that the nexus between the PLA and the Borough's important interests is "close." Therefore, we hold that even if the PLA impairs the right of non-union workers to engage in an economic endeavor, it does not violate their equal protection rights under the Alaska Constitution.[10]

## B. *The Borough's Action Did Not Violate the Borough's Procurement Code.*[11]

■ In defending the superior court's decision to strike the Hiring Hall Provision and in arguing on cross-appeal that the court should have declared the PLA as a whole invalid, Lampkin contends that the Bor-

ough's use of the PLA violates its procurement code.[12] She specifically relies on the procurement code provisions enunciating the policy of "maximum practicable competition" and dealing with "sole source procurement."[13] The Borough responds that its procurement code provides sufficient discretion to allow it to include the bid specification at issue so as to "ensure legitimate, reasonable proprietary goals," even if the specification affects competition. It rejects Lampkin's claim that the Borough, before adopting the bid specification, "was required to establish: (1) that the PLA specifications promoted overall economy for the purposes intended; (2) that the PLA encouraged maximum free and open competition satisfying the Bor-

10. Lampkin, relying on *Enserch*, also argues that the Borough, by attempting "to benefit one class of Fairbanksans over another," violates the intrastate "privileges and immunities" component of the equal protection clause. To the extent that intrastate privileges and immunities apply to cases that involve discrimination between residents of the same region, the analysis would be the same as that under the equal protection clause, and we therefore do not consider this argument separately.

Lampkin also argues that the Borough's use of the PLA violated substantive due process. To meet the requirements of due process, legislation must be rationally related to a valid legislative purpose. *See Concerned Citizens v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974). Because the Borough's action survives close scrutiny, it survives this lower level of scrutiny. *See Enserch*, 787 P.2d at 632 n. 12.

11. Although Lampkin contends that we should use our independent judgment in reviewing the legality of the PLA under the Borough procurement code, we conclude that the "reasonable basis" standard of review applies to the Borough's interpretation of its own ordinances when this interpretation implicates complex matters or the formulation of fundamental policy. *See Lazy Mountain Land Club v. Matanuska–Susitna Borough, Bd. of Adjustment & Appeals*, 904 P.2d 373, 385 & n. 68 (Alaska 1995). This more deferential standard "properly recognizes that the [Borough] is best able to discern its intent in promulgating" its procurement code. *Rose v. Commercial Fisheries Entry Comm'n*, 647 P.2d 154, 161 (Alaska 1982); *see also Gunderson v. University of Alaska, Fairbanks*, 922 P.2d 229, 233 (Alaska 1996) (holding that appropriate standard for reviewing the decision of state agency's chief procurement officer is reasonable basis standard). Under this standard, we "need not find that [the Borough's] construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Un-*

*employment Compensation Comm'n v. Aragon*, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946).

12. Lampkin also argues that the Borough's use of the PLA violated the state procurement code, AS 36.30. However, as the Borough contends, the state procurement code does not apply to the Lathrop High Project because the project is not an "expenditure of state money by the state, acting through an agency, under a contract," and because the state funding for the project is provided by grants, which are expressly exempted from the code's requirements. *See* AS 36.30.850(b) & (b)(1).

13. Fairbanks North Star Borough Code (FNSB) 16.35.010 (1993) provides:

*Maximum practicable competition.* All specifications shall be drafted so as to promote overall economy for the purposes intended and encourage maximum free and open competition in satisfying the borough's minimum needs, and shall not be unduly restrictive. The policy enunciated in this section applies to all specifications, including but not limited to, those prepared for the borough by architects, engineers, designers and draftsmen.

FNSB 16.30.040 (1993) provides:

*Sole source procurement.* A contract may be awarded without competition when the purchasing agent determines in writing, after conducting a good faith review of available resources, that there is only one source for the required supply, service or construction item. The purchasing agent shall conduct negotiations, as appropriate, as to price, delivery, and terms. A record of sole source procurements shall be maintained that lists each contractor's name, the amount and type of each contract, a listing of the item(s) procured under each contract, and the identification number of each contract file.

ough's minimum needs; and (3) that the PLA was not unduly restrictive."

Resolution of this issue requires careful analysis of the Borough procurement code's language. First, however, it is instructive to examine the decisions of other courts that have addressed the validity of project labor agreements under state procurement codes. The New York Court of Appeals concluded that such agreements "are neither absolutely prohibited nor absolutely permitted in public construction contracts" under the state's procurement code. *New York State Chapter, Inc. v. New York State Thruway Auth.*, 88 N.Y.2d 56, 643 N.Y.S.2d 480, 482, 666 N.E.2d 185, 187 (1996) (*New York State Thruway*). The court stated that a "PLA will be sustained for a particular project where the record supporting the determination to enter into such an agreement establishes that the PLA was justified by the interests underlying the competitive bidding laws." *Id.* 643 N.Y.S.2d at 482–83, 666 N.E.2d at 187–88.

In that case the court considered project labor agreements associated with two projects, one a four-year project to improve the Tappan Zee Bridge and the other a five-year project to modernize the facilities of a cancer institute. *See id.* at 485, 487, 666 N.E.2d at 190, 192. The agency in charge of the bridge project "determined that efficiency in completing the project, once commenced, is important to protect a major revenue-producing asset, maximize public safety, and minimize inconvenience to the traveling public." *Id.* at 485, 666 N.E.2d at 190. A prior project on the bridge had been subject to a labor dispute, and the bridge had been picketed. *See id.* After a consultant estimated in a "detailed report" that a PLA would result in labor saving of at least $6 million, the state agency negotiated and signed a project labor agreement. *Id.* at 486, 666 N.E.2d at 191. The court of appeals held that the PLA for the bridge project did not violate state procurement laws because it was "directly tied to competitive bidding goals." *Id.* It stated:

> The Thruway Authority's detailed focus on the public fisc—both cost savings and uninterrupted revenues—the demonstrated unique challenges posed by the size and complexity of the project, and the cited

labor history collectively support the determination that this PLA was adopted in conformity with the competitive bidding statutes.

*Id.*

The court then turned to the project labor agreement for the cancer institute project. The court held that the PLA was not "consistent with the principles underlying the competitive bidding statutes." *Id.* at 488, 666 N.E.2d at 193. It determined that the responsible agency failed to show any "cost savings ... or any unique feature of the project which necessitated a PLA," and that the agency "had already let up to six contracts through competitive bidding on the project with no evidence of reduced efficiencies." *Id.* The court stated that a "[p]ost hoc rationalization ... cannot substitute for a showing that, prior to deciding in favor of a PLA, the agency considered the goals of competitive bidding." *Id.* The crux of the court's concern was that the agency show "something more" than a generalized "desire for labor stability so that the work will be completed on time." *Id.* at 488–89, 666 N.E.2d at 193–94.

The New Jersey Supreme Court determined that a PLA was invalid under the state procurement laws in *George Harms Construction Co. v. New Jersey Turnpike Authority*, 137 N.J. 8, 644 A.2d 76 (1994). *George Harms* involved a project to widen the New Jersey Turnpike. *Id.* 644 A.2d at 79. The plaintiff contractor submitted the lowest bid on the project, and a week later the agency in charge of the project adopted a resolution to require "as a condition of all contracts" that successful bidders "enter into project labor agreements with the appropriate affiliated locals of the Building and Construction Trades Council of the AFL–CIO of the State of New Jersey." *Id.* In concluding that this PLA requirement was invalid, the court considered the policy underlying the procurement code, focusing on three factors: (1) the "unfettered competition" fostered as "[t]he paramount policy of [the state's] public-bidding laws"; (2) its concern that the legislature had not addressed the policy issues implicated by the agreement; and (3) its interpretation of the agreement as a "sole

source" contract for construction services. *Id.* at 95; *see also Tormee Constr., Inc. v. Mercer County Improvement Auth.,* 143 N.J. 143, 669 A.2d 1369 (1995).

Finally, an intermediate appellate court in Ohio upheld a project labor agreement in *State ex rel. Associated Builders & Contractors, Central Ohio Chapter v. Jefferson County Board of Commissioners,* 106 Ohio App.3d 176, 665 N.E.2d 723 (1995). The court held that the agreement did not conflict with the purpose of the competitive bidding statutes, which it stated was "to enable a public contracting authority to obtain the best work at the lowest possible price while guarding against favoritism and fraud." *Id.* 665 N.E.2d at 727.

In considering the application of these precedents, we first turn to the interests underlying the procurement code at issue. The Borough's code states that its purpose "is to provide for the fair and equitable treatment of all persons involved in public purchasing by the borough, to maximize the purchasing value of public funds in the procurement, and to provide safeguards for maintaining a procurement system of quality and integrity." FNSB 16.21.010 (1993). The code further enunciates a "policy" of "maximum practicable competition," providing that "[a]ll specifications shall be drafted so as to promote overall economy for the purposes intended and encourage maximum free and open competition in satisfying the borough's minimum needs, and shall not be unduly restrictive." [14] FNSB 16.35.010.

While we have never addressed the interests underlying the Borough's procurement

code, we have stated generally that the purposes of competitive bidding are

> to prevent fraud, collusion, favoritism, and improvidence in the administration of public business, as well as to insure that the [state] receives the best work or supplies at the most reasonable prices practicable. ... [T]he requirement of public bidding is for the benefit of property holders and taxpayers, and not for the benefit of the bidders; and such requirements should be construed with the primary purpose of best advancing the public interest.

■ *McBirney & Assocs. v. State,* 753 P.2d 1132, 1135–36 (Alaska 1988) (quoting *Gostovich v. City of West Richland,* 75 Wash.2d 583, 452 P.2d 737, 740 (1969)). In light of these principles, we are not persuaded that this case calls for the highly restrictive approach applied to project labor agreements by the New Jersey Supreme Court.[15]

First, although the Borough's procurement code states the policy objective that specifications should be written so as to encourage "maximum practicable competition," this policy does not require the "unfettered competition" that the *George Harms* court found required by the procurement code at issue there. 644 A.2d at 95. Indeed, close textual analysis of the procurement code reveals that "encourag[ing] maximum free and open competition" must be balanced against "satisfying the borough's minimum needs." FNSB 16.35.010. In this case, as discussed above, the Borough's minimum needs included performance of the school construction with as little disruption of classes as possible, flexible scheduling, and elimination of the potential for strikes.[16] Considered in the context of

---

**14.** With regard to "sole source procurement," the code provides in part:

> A contract may be awarded without competition when the purchasing agent determines in writing, after conducting a good faith review of available sources, that there is only one source for the required supply, service or construction item.
> FNSB 16.30.040.

**15.** In his concurrence in *Libby v. City of Dillingham,* 612 P.2d 33 (Alaska 1980), Justice Rabinowitz observed that "as a general rule municipal corporation competitive bidding requirements are construed narrowly, since '[i]n the absence of some statutory provision, com-

petitive bidding is not an essential prerequisite to the validity of contracts by and with public bodies.'" *Id.* at 44 (Rabinowitz, J., concurring) (quoting *People ex rel. Adamowski v. Daley,* 22 Ill.App.2d 87, 159 N.E.2d 18, 20 (1959)). In addition, Justice Rabinowitz pointed out that "[t]he reason for this rule of narrow construction is pragmatic; there are contexts in which a requirement of competitive bidding impedes rather than enhances the efficiency of municipal government." *Id.* at 45.

**16.** The dissent contends that this case turns on "whether the specification in question encourages maximum practicable competition." Diss. at 443. It asserts that the term "practicable"

such "minimum needs," the PLA is not an "unduly restrictive" specification.

■ Furthermore, contrary to the determination of the *George Harms* court, we do not believe that the use of the PLA amounts to sole source procurement. *See* 644 A.2d at 95. The provision of the procurement code governing sole source procurement is implicated only when a contract is "awarded without competition." FNSB 16.30.040. Even assuming that the PLA affected competition as Lampkin asserts, it cannot be construed as limiting bidding to any particular contractor. *See New York State Thruway,* 643 N.Y.S.2d at 486, 666 N.E.2d at 191 (stating that "[t]he fact that certain nonunion contractors may be disinclined to submit bids does not amount to the preclusion of competition"). Indeed, the record indicates that an invitation to bid on another Borough project that included a project labor agreement drew an above-average number of bidders.

■ Rather, we conclude that the correct approach to this issue is that taken by the New York and Ohio courts, as modified by the deferential standard appropriate to a review of the Borough's own interpretation of its procurement code. Thus, the question in this case is whether the Borough had a reasonable basis to determine that the PLA furthered the interests underlying the Borough's procurement code. After reviewing the record, we hold that it did.[17] The project unquestionably presented special challenges to the Borough. Located in downtown Fairbanks, the Lathrop High Project was the biggest construction project ever undertaken by the Borough. Furthermore, the project

required flexible scheduling so that construction would not interfere with classes. As discussed above, the PLA helped the Borough to meet these challenges by allowing for flexibility in scheduling, assuring that such scheduling would add as little as possible to the cost of the project, and eliminating the potential for strikes or other labor difficulties. Collectively, these considerations support the determination by both Mayor Sampson and the Borough Assembly, made prior to the adoption of the PLA bid specification, that the use of the PLA accorded with the objectives of the procurement code. Specifically, the Borough had a reasonable basis to find that the PLA would operate "to maximize the purchasing value of public funds in the procurement" for the project, while encouraging "maximum free and open competition in satisfying the [B]orough's minimum needs."[18] FNSB 16.21.010 & 16.35.010.

As even the *George Harms* court noted in striking down a project labor agreement, the policy choice presented by the use of such agreements is a "close" one. *See* 644 A.2d at 95. While such an agreement may restrict competition, "the lessened competition may produce other aspects of efficiency." *Id.; see also Libby v. City of Dillingham,* 612 P.2d at 45 (Rabinowitz, J., concurring) (noting that "there are contexts in which a requirement of competitive bidding impedes rather than enhances the efficiency of municipal government"). In this case, both the Borough's administrative and legislative branches considered the advantages of the PLA for the Lathrop High Project and decided that it would best serve the Borough's interests.[19]

---

"clearly relates to cost." Diss. at 440. Because we conclude that what is "practicable" depends not only on cost, but on the Borough's other needs as well, we favor a broader understanding of the term.

**17.** We note that because of the overlap between the interests underlying the Borough's procurement code and the "important interests" justifying the Borough's impairment of the right of non-union workers to engage in an economic endeavor, our analysis of the PLA under the equal protection clause is fundamentally similar to our analysis of its validity under the procurement code.

**18.** Indeed, we believe that the PLA in this case would survive even a requirement that the Borough show "more than a rational basis." *New York State Thruway,* 643 N.Y.S.2d at 485, 666 N.E.2d at 190. That is, on the record before us, the Borough met "the burden of showing that the decision to enter into the PLA had as its purpose and likely effect the advancement of the interests embodied in the competitive bidding statutes." *Id.*

**19.** We note that this case can be distinguished from *George Harms* and that part of the opinion in *New York State Thruway* striking down one of the two PLAs at issue, as we are not faced with a situation in which the administrative branch of

After examining the Borough's procurement code and the interests underlying it, we hold that the Borough's use of a PLA for the Lathrop High Project does not violate the mandates of its procurement code.

### C. *The PLA Did Not Violate Other Constitutional Rights of Non-union Workers or Contractors.*

■ Lampkin argues on cross-appeal that the Borough violated the equal protection rights of non-union contractors by forcing them "to sign an unwanted, unnegotiated bargaining agreement," barring them "from utilizing an experienced work force with known qualities," subjecting them "to unfamiliar work rules," and binding them by "other alien, undisclosed internal union provisions." We disagree. The provisions of the PLA apply equally to all contractors on the project, whether union or non-union. As the United States Supreme Court stated in *Boston Harbor*, when contractors are confronted by a bid specification requiring them to enter a project labor agreement, they "are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement." 507 U.S. at 231, 113 S.Ct. at 1198; *see also Associated Builders & Contractors, Inc. v. City of Seward*, 966 F.2d 492, 499 (9th Cir.1992) (upholding city's requirement that contractors bidding on public project sign a labor agreement with a union against a federal equal protection challenge by non-union contractors alleging that the clause constituted state action favoring union contractors). We find no authority for the proposition that non-union contractors have a constitutionally protected right to be free of such bid specifications. Therefore, we hold that the PLA does not violate the equal protection rights of non-union contractors.

■ Lampkin also argues that the superior court erred in its ruling with regard to the Fringe Benefits Provision. The superior court ruled that the PLA could not require employers to make contributions to funds that did not vest during the project. It thus prohibited the enforcement of the requirement that employers contribute to union pension funds, but upheld the requirement that employers contribute to other health and welfare funds. Specifically, Lampkin argues that requiring employers to contribute to any particular fringe benefit fund constitutes an unconstitutional taking under article I, section 18 of the Alaska Constitution.[20] The Unions, on the other hand, contend that the trial court erred by modifying the effect of the Fringe Benefits Provision with respect to pension funds.

The first step in analyzing Lampkin's argument under the takings clause is to identify the property interest at issue. *See DeLisio v. Alaska Superior Court*, 740 P.2d 437, 440 (Alaska 1987). Under AS 36.05.010, all employers, union and non-union, must pay at least the "prevailing wage" on public construction projects. The prevailing wage includes the "basic hourly rate" and fringe benefits, 8 Alaska Administrative Code (AAC) 30.900(16) (1996), which are to be paid "into the appropriate union trust, approved private pension plan, or other approved fringe benefit plan." 8 AAC 30.900(6)(B).

However, according to Lampkin and testimony at trial, many non-union employers, rather than contributing to health insurance or pension funds, pay fringe benefits directly to employees. She argues that non-union employees therefore have a protected property interest in receiving the fringe benefit portion of their wages as cash rather than as a contribution by the employer to a benefit plan or union trust. This is not correct. Workers on public projects have no right to receive their fringe benefits directly from the employer rather than in the form of employer contributions to approved fringe benefits plans, regardless of whether those plans will

government is balancing the interests of labor, management, and the public without the involvement of the legislative branch. Here, the Borough Assembly passed a resolution specifically considering these interests and approving the use of the PLA for the Lathrop High Project.

**20.** Article I, section 18 of the Alaska Constitution provides: "Private property shall not be taken or damaged for public use without just compensation."

vest during the project.[21] Thus, the PLA's requirement that employers make such contributions does not affect a protected property interest. Therefore, the Fringe Benefits Provision does not violate the takings clause of the Alaska Constitution, and the superior court erred in modifying it so as not to require employers to contribute to pension funds.

Finally, Lampkin challenges the provision of the PLA requiring all workers under the agreement to pay "periodic dues and fees as uniformly required by the Unions." She argues that this requirement violated her right under article I, section 6 of the Alaska Constitution[22] to be free of "forced association." As Lampkin points out, the United States Supreme Court has held that unions may not require members to provide funds "for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representatives." *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235–36, 97 S.Ct. 1782, 1800, 52 L.Ed.2d 261 (1977). The Court has made clear that unions representing public employees must finance their political expression only "from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment." *Id.* at 236, 97 S.Ct. at 1800. However, the Court has also established that the government may constitutionally require government employees to pay union dues to support "[t]he tasks of negotiating and administering a collective-bargaining agree-

ment and representing the interests of employees in settling disputes and processing grievances." *Id.* at 221, 97 S.Ct. at 1792; *see also* AS 23.40.110(b)(authorizing a public employer to make "an agreement with an organization to require as a condition of employment ... payment by the employee to the exclusive bargaining agent of a service fee to reimburse the exclusive bargaining agent for the expense of representing the members of the bargaining unit").

We conclude that Lampkin's argument on this issue fails because she has not established or even clearly alleged that any dues paid under the PLA will be used by the Unions to support political expression. The only testimony on this issue was that of Jay Quakenbush, a union representative. He testified that the political activities of his union are financed by a separate fund created from the voluntary contributions of members, not by union dues. In the absence of any evidence supporting Lampkin's claim, we refuse to assume that the Unions would exact dues beyond those "necessary to 'performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues.'"[23] *Communications Workers of America v. Beck*, 487 U.S. 735, 762–63, 108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988) (quoting *Ellis v. Brotherhood of Railway Clerks*, 466 U.S. 435, 448, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428 (1984)).

### D. The Superior Court Erred In Denying the Unions' Motion to Intervene.[24]

Finally, we consider whether the superior court erred in denying the Unions' motions

---

**21.** To the extent that the superior court based its ruling on its interpretation of the particular pension funds at issue rather than on the takings clause, we note that federal law governs the administration of pension plans and preempts state law that has a "connection with" or "reference to" such a plan. *California Div. of Labor Standards Enforcement v. Dillingham Constr. N.A.*, 519 U.S. 316, ——, 117 S.Ct. 832, 837, 136 L.Ed.2d 791 (1997). In this case, the evidence is undisputed that the pension plans at issue, including the vesting requirement, comply fully with the requirements of the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1001 *et seq.* (1985 and West Supp.1997).

**22.** Article I, section 6 of the Alaska Constitution provides: "The right of the people peaceably to assemble, and to petition the government shall never be abridged."

**23.** Because Lampkin failed to establish that the unions would assess dues under the PLA beyond those necessary to represent workers, we also reject her argument that the PLA's requirement that non-union workers pay such dues is an unconstitutional taking.

**24.** We review the superior court's denial of an Alaska Civil Rule 24 motion to intervene under an abuse of discretion standard. *See Hertz v. Cleary*, 835 P.2d 438, 440 n. 1 (Alaska 1992).

to intervene. The superior court stated that it denied the motions because it "did not feel that the individual unions were indispensable parties to this declaratory judgment action, nor that their presence was necessary to resolve the issues before it."

■ We apply a four-part test to determine whether a motion to intervene as of right should be granted:

(1) the motion must be timely; (2) the applicant must show an interest in the subject matter of the action; (3) it must be shown that this interest may be impaired as a consequence of the action; and (4) it must be shown that the interest is not adequately represented by an existing party.

*State v. Weidner,* 684 P.2d 103, 113 (Alaska 1984). Lampkin argues that the Unions' motions to intervene were not timely, that the Unions had no interest in the subject matter of the action, and that the Unions' interests were adequately represented by the Borough.

■ We conclude that the Unions' motions were timely filed. The Unions moved to intervene in federal court approximately one week after the complaint was filed. They brought their motions to the attention of the state superior court on the day that court received the certificate of remand from the federal court. Lampkin's argument that the Unions should have filed earlier with the state court ignores that fact that the state court apparently did not have jurisdiction of the case prior to receiving the certified copy of the order remanding the case from federal district court. *See* 28 U.S.C. § 1447(c) (1994) (stating that when the federal district court remands to state court "[a] certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court" and the "State court may thereupon proceed with such case"). Indeed, the only reason that the motions to intervene might be considered untimely was the speed with which the trial court conducted the litigation, moving from complaint to trial in little more than two weeks. The quick scheduling of these proceedings, even if timed to accommodate the interests of Lampkin and the Borough, should not be held against the Unions.

■ We also conclude that the Unions had a direct interest in the subject matter of the action. Lampkin, relying on *Weidner,* contends that the interest of the Unions was "contingent" and therefore did not justify intervention as of right. In *Weidner,* we stated that "the requisite interest for intervention as a matter of right must be direct, substantial, and significantly protectable." 684 P.2d at 113. In that case, we considered a motion to intervene in an action challenging the legality of a land lottery by the winners of the lottery. *See id.* at 106–07. The superior court had issued an interlocutory order permitting the lottery "to be conducted in the interest of administrative efficiency and convenience, but specifically ordered that no interest or title would vest in the lottery winners pending the outcome of [the] litigation." *Id.* at 113. After the lottery, the winners moved to intervene on all counts, and the superior court denied the motion except as to one count. *See id.* The lottery winners appealed, and we affirmed, holding that the interest of the lottery winners was a "contingent" interest insufficient to justify intervention as of right. *Id.*

Lampkin is correct that the PLA did not become an executed bargaining agreement until the successful bidder signed it. However, the Unions' interest in the PLA is broader than merely their contractual right to enforce the terms of the PLA and thus is distinguishable from the interest at issue in *Weidner.* The lottery winners in *Weidner* took their interest after the litigation in which they sought to intervene had begun and were thus on notice of the contingent nature of their interest prior to obtaining it. The Unions, on the other hand, participated in negotiating the PLA and were not merely beneficiaries of a challenged administrative process. Their stake in the implementation of the PLA, arising during their negotiation of the PLA and thus prior to Lampkin's challenge, was as direct, substantial, and significantly protectable as the Borough's. Therefore, the Unions' interest was sufficient to warrant intervention.

■ Finally, we determine that this interest was not adequately represented by the

Borough. As the Unions point out, Lampkin's claim that the interests of the Borough and the Unions were "identical" is inconsistent with the fact that the PLA was a product of negotiations between the two entities. Clearly, the Borough's interest in preserving the PLA, and hence the concessions on wages, hours, and working conditions it had won, did not coincide with the Unions' interest in protecting other provisions of the agreement. This divergence in interests is demonstrated by the Borough's failure to appeal the superior court's decision to modify the Fringe Benefits Provision, a provision of considerable importance to the Unions on appeal.

Therefore, we hold that the superior court abused its discretion in denying the Unions' motion to intervene as of right. The court's ruling unfairly denied the Unions a full opportunity to defend their substantial interest in the PLA.

## IV. CONCLUSION

For the above reasons, we conclude that the Borough's decision to require successful bidders on the Lathrop High Project to sign the PLA did not violate state or Borough law.[25] Therefore, we VACATE and REVERSE the superior court's orders striking the Hiring Hall Provision and modifying the Fringe Benefit Provision and AFFIRM its ruling upholding the rest of the PLA.

MATTHEWS, J., dissenting.

MATTHEWS, Justice, dissenting.

### I.

Section 16.35.010 of the Fairbanks North Star Borough Procurement Code is titled "Maximum practicable competition." It requires that "all specifications shall ... encourage maximum free and open competition...."[1] The text of the ordinance, taken together with the title, mandates that all specifications facilitate maximum practicable free and open competition. By contrast, the PLA discourages competition by disadvantaging both open shop contractors and subcontractors. It thus violates the Borough Code, unless it would not be practicable to bid without the PLA. As the Borough has not shown that bidding without the PLA would be impracticable, using the PLA violates section .010 of the code.

The PLA is a contract specification. It requires that all contractors and subcontractors on the Lathrop High School project employ only union workers. In other words, all contractors and subcontractors must either be, or become, union shop employers. "Open shop" contractors and subcontractors employ workers without regard to union affiliation. While open shop contractors are not legally excluded from bidding on the project, they are placed at a serious disadvantage, since, as the trial court found, the restrictive hiring hall practices of the unions limit their ability to employ their permanent or accustomed work crews.[2] Further, the PLA requires all contractors to make fringe benefit payments into union health and pension plans. For open shop contractors that maintain their own plans this can result in a double payment for fringe benefits.[3] And, assuming that open shop contractors are able to employ their permanent workers, the workers may not benefit from the union

25. Because of this decision, we do not need to consider Lampkin's arguments that the superior court violated the doctrine of separation of powers by striking only portions of the PLA. We also do not need to address the Borough's arguments that the superior court abused its discretion in its scheduling of the combined hearing and trial and erred by failing to join the unions under Alaska Civil Rule 19(a). Finally, we do not address any arguments regarding the preemptive effect of the National Labor Relations Act.

1. The full text of section 16.35.010 is as follows:

**Maximum practicable competition.** All specifications shall be drafted so as to promote overall economy for the purposes intended and encourage maximum free and open competition in satisfying the borough's minimum needs, and shall not be unduly restrictive. The policy enunciated in this section applies to all specifications, including but not limited to, those prepared for the borough by architects, engineers, designers and draftsman.

2. *See also* United States General Accounting Office, General Government Division, *Briefing Report to the Honorable Steve Symms, U.S. Senate: Labor–Management Relations*, 91–80BR (May 1991) at 5, 22–23.

3. *Id.* at 5, 22–24.

health and pension plans because they may not work long enough to meet vesting thresholds.[4]

Open shop contractors and subcontractors make up a significant part of the construction industry. About seventy-five percent of all construction work in the United States is performed by open shop contractors.[5] Further, about eighty percent of the construction workers in the United States are nonunion.[6]

Does the PLA then "encourage maximum free and open competition" as required by the Borough Code? Obviously, by discouraging participation by open shop contractors it does just the opposite. Is it thus illegal? The answer may be yes, *per se*. However, the title of section .010 suggests that the requirement of maximum competition is not absolute, and that what is actually required is maximum "practicable" competition. If so, the PLA contravenes the Borough Code un-

less there exist overriding reasons which render "impracticable" a bid package which does not contain a PLA.[7]

"Practicable" means "possible to practice." *Webster's Third New Int'l Dictionary* 1780 (1968). "Reasonably possible" is a synonymous phrase. In the context of section .010 the term clearly relates to cost. Thus the question is whether it would be reasonably possible from a cost standpoint for the Borough to bid the Lathrop project without the PLA specification.

The Borough has not shown that bidding the project without a PLA specification would be economically unreasonable. The Borough Assembly passed a resolution stating that PLAs "have proven to be of economic benefit to their owners." This statement may be true in some cases, as where PLA's prevent expensive work stoppages. But this

---

4. *Id.* at 23–24. One witness, the president of an open shop construction company in Fairbanks which employed more than 600 construction workers, detailed the deterrent effects of the Project Labor Agreement on open shop contractors, and workers, as follows:

> The effect of the Project Labor Agreement as contained in the specifications for the Project will be to deter open shop contractors and subcontractors from submitting bids and sub-bids for the Project. These potential open shop bidders will not be able to accurately estimate their costs and they will be required to abandon their long-time employees. Open shop contractors will not be able to utilize the historical productivity rates of their open shop construction craft employees and will have to base their estimates of labor productivity on the unknown capability and motivation of union construction craft workers and the unknown effects of restrictive union jurisdictional rules and work practices. As a consequence of the PLA on the Eielson Elementary School project ("Eielson Project") which was bid on Tuesday, March 26, 1996, no open shop general contractors submitted bids. By effectively excluding open shop general contractors from bidding the Eielson Project, the Borough significantly limited the free and open competition which its statutes require it to practice when procuring public works construction projects.
>
> The PLA on this Project operates to exclude open shop construction craft workers in two ways. First, to the extent that open shop general and specialty contractors and subcontractors do not bid the Project, the employees and potential employees of these entities will not be able to work on the Project because they are not members of the Fairbanks Unions. Sec-

ond, even if open shop contractors and subcontractors submitted low bids on the Project, few open shop employees would be able to work on the Project due to the restrictive hiring hall practices of the Fairbanks Unions. Even if open shop construction craft employees were able to join the Fairbanks Unions, it is unlikely that more than a very few would be able to run the gauntlet of the restrictive Fairbanks Unions' hiring hall practices and actually obtain employment on the Project. Those who did join the Fairbanks Unions and did obtain employment on the Project ... would be involuntarily required to pay substantial sums of money in the form of dues, assessments and health and welfare contributions, the benefits of which they would never realize because of the restrictive vesting requirements imposed by these unions.

Affidavit of George Osborne, Jr.

5. H.R. Northrup, *"Salting" The Contractor's Labor Force: Construction Unions Organizing With NLRB Assistance*, J. Lab. Res., Vol. XIV, No. 4 at 470 (1993).

6. Bureau of Labor Statistics, U.S. Dep't of Labor, *Employment and Earnings* (Jan. 1, 1994).

7. The Attorney General has interpreted the similar but less demanding requirement of AS 36.30.060(c) that specifications must "encourage competition in satisfying the state's needs" as prohibiting project labor agreements except where a showing can be made that "requiring prospective contractors to use organized labor was the only available means to assure the construction." 1990 Informal Op. Att'y Gen. 9 (July 1, 1990).

statement does not establish that bidding this project without a PLA would not be reasonably possible.[8] Although Mayor Sampson testified that, in his view, the PLA specification would "ensure labor stability" for the Lathrop project, it is equally clear from his testimony that there had been no work stoppages on any school construction project during his term as mayor. *Cf. Empire State Chapter of Associated Builders & Contractors, Inc. v. City of Oswego*, 659 N.Y.S.2d 672 (N.Y.App.Div.1997) (concluding that absent a history of labor unrest, "gener-

al concern[s] that the project be complete in a timely manner" do not justify the use of a PLA).

Intuitively, PLAs would seem to increase rather than decrease costs, because they reduce the pool of interested bidders.[9] The Borough responds that it has wrested concessions from the unions participating in the PLA. It is, however, speculative as to whether these would result in a bid lower than one that would have been submitted by a contractor deterred by the PLA from bidding.[10]

8. The trial court suggested, but did not specifically find, that the dominant motive underlying the Assembly resolution was a desire to ensure the hiring of local construction workers on the project. Thus the trial court described the discussion leading up to the passage of the resolution as follows:

> Mayor Sampson thereafter introduced a resolution supporting the use of Project Labor Agreements on the Eielson and Lathrop projects. The Assembly took testimony from Mr. Swarner [of the Trades Council], who outlined the benefits the Borough would purportedly receive if it adopted the PLA. Swarner particularly stressed the local hire aspects of PLAs as most unions have restrictive residency requirements. Swarner did indicate that if the successful bidder was from Anchorage or the lower 48, they would be allowed to bring up their key people for the project.
>
> Mayor Sampson spoke next and also lauded the concessions contained in the PLA. He also acknowledged the local hire advantages inherent in PLAs, although he stressed that was not the intent behind the agreement. Mayor Sampson assured the Assembly that the building trades had agreed in another document that they would practice local hire, but that it was not the proper function of the borough government to compel local hire in its public works contracts. The Assembly then acknowledged the 200 union workers in attendance and promptly passed the resolution supporting the use of PLAs.

Later, the trial court described the Borough's motivation as follows:

> As to the legitimacy of the Borough's purpose, the Court must give great deference to the legislative body. Here, the Assembly supported the PLA because it was found to provide an economic benefit to the Borough as owner of the project. Although it appears from the minutes of the Assembly meeting that local hire was considered a substantial benefit, this issue was not mentioned in the language of the Assembly's resolution. Supporting local hire would not have been a legitimate reason for the Borough to support this PLA. Economic benefits, however, which flow to the Borough when acting in its proprietary function, are a

legitimate reason which the Court will not second guess.

And, still later in its decision, the trial court stated: "The Assembly was clearly concerned with local hire rather than fostering free and open competition."

9. The law journal article cited by the majority opinion, Henry H. Perritt, Jr., *Keeping the Government Out of the Way: Project Labor Agreements Under the Supreme Court's Boston Harbor Decision*, 12 Lab. Law. 69 (1996), acknowledges this possibility, but is undisturbed by it:

> PLA requirements may be attacked because they possibly result in award to a bidder who quotes a price higher than a bidder who has been disqualified by the PLA requirement. But the same thing can be said for any bid specification that tends to exclude some potential bidders. The question should be whether the bid specification is a legitimate requirement for the project. State procurement laws almost always require award to the lowest "responsible" bidder or lowest "best" bidder, signifying that no state legislature believes that price is the only consideration. Rather, requests for proposals and other bid specifications may specify various requirements for public works projects even though the requirements have the effect of excluding some bidders and increasing the price. Because project labor agreements are legitimate in the narrow sense that they preserve labor peace on a project, and also in the broader sense that they facilitate private, decentralized governance of project activities, they are entirely consistent with the basic concept of public bidding.
>
> *Id.* at 87–88.

10. Lampkin introduced a study relating to large electrical intertie projects in Alaska indicating that including a PLA specification with union concessions will result in higher bids than bidding without such a specification. Herbert R. Northrup & A.J. Thieblot, Chugach Electric Association Study, *Cost Review for Contracting Alternatives for Transmission Facilities in Alaska* ivv, 62–67 (Jan.1996). The Borough has failed to engage in any specific projection of how the PLA may result in lower bids. *Cf. New York State*

Further, it has not been shown that union shop bidders could not obtain the same or better concessions on their own.

Public owners have been contracting in Alaska without PLAs since statehood. Was it then not reasonably possible for the Borough to bid the Lathrop project without a PLA? The answer, in my view, is that on this record the Borough has fallen well short of making such a showing.

I would therefore reverse the decision of the superior court and remand this case with instructions to enjoin the invitation for bids. Thereafter, the Borough would be able to solicit bids for the project without a PLA. Alternatively, the Borough Assembly could, by ordinance, amend the Borough Code to permit the use of PLAs.

## II.

In the above paragraphs I have explained how I think that this case should be decided. In what follows I will explain my disagreement with three aspects of today's opinion concerning the Borough Code.

First, the court does not use a textual approach in determining whether the maxi-

mum free and open competition clause of section .010 has been violated. Instead of focusing on the specific language of section .010, the court relies on cases from New York and Ohio.[11] The only statutes quoted in those cases are statutes requiring that bids be awarded to the lowest responsible bidder. *See New York Thruway Auth.*, 643 N.Y.S.2d at 484, 666 N.E.2d at 189, 193; *Jefferson County Bd. of Comm'rs*, 665 N.E.2d at 727. These cases do not refer to a requirement that specifications must be drafted to encourage maximum competition.[12] Even though the New York and Ohio cases did not discuss requirements analogous to the specifications requirement of section .010, this court draws from these cases the principle which it uses to decide this case. The principle is that so long as there exists a reasonable basis to conclude that a specification furthers "the interests underlying the Borough's procurement code," the specification is lawful. Op. at 435. The court has thus approached this case as if there were a common law of competitive bidding which, at bottom, merely requires that public agencies act reasonably in light of the multiple purposes of competitive bidding.[13]

*Chapter, Inc. v. New York State Thruway Auth.*, 88 N.Y.2d 56, 643 N.Y.S.2d 480, 486, 666 N.E.2d 185, 191 (1996) (upholding a PLA specification where the bridge authority commissioned a "detailed" study of cost savings).

**11.** The cases are *New York State Chapter, Inc. v. New York State Thruway Authority*, 88 N.Y.2d 56, 643 N.Y.S.2d 480, 666 N.E.2d 185 (1996), and *State ex rel. Associated Builders & Contractors v. Jefferson County Board of Commissioners*, 106 Ohio App.3d 176, 665 N.E.2d 723 (1995).

**12.** In that respect, those cases are unlike *George Harms Construction Co. v. New Jersey Turnpike Authority*, 137 N.J. 8, 644 A.2d 76, 94 (1994), which is based on a New Jersey statute requiring that all specifications be drawn "in a manner to encourage free, open and competitive bidding." The court in that case found that the PLA specification did not meet this requirement and was invalid. *Id.* 644 A.2d at 95. The New Jersey statute, in turn, is similar to the mandate of the Fairbanks ordinance that specifications "encourage maximum free and open competition."

**13.** Further, I do not agree that the result in this case could be justified under New York authority even if similar statutes were involved. The majority concludes "that the correct approach ... is that taken by the New York ... courts, as modi-

fied by the deferential standard...." Op. at 435. Since the hallmark of the New York approach is a heightened standard of review requiring "more than a rational basis," *New York State Thruway Auth.*, 643 N.Y.S.2d at 485, 666 N.E.2d at 190, the majority's use of a deferential standard of review marks a fundamentally different approach.

The majority also notes that if the New York heightened standard of review were used, utilization of the PLA in this case would be permissible. Op. at 435 n. 18. Comparison of the salient facts of this case with the two projects reviewed in *New York State Thruway Authority* shows that the important features of this project more closely resemble the project to modernize the cancer facility for which the New York court rejected the use of a PLA, rather than the project to improve the bridge for which the court approved of its use. The Roswell Park Cancer Institute project involved the five-year comprehensive renovation of 18 buildings spread over a 25–acre campus. *New York State Thruway Auth.*, 643 N.Y.S.2d at 492, 666 N.E.2d at 196 (Smith, J., dissenting). The adopting authority's primary concerns included the minimization of any disruption in the patients' routines and the avoidance of delays in construction. *Id.* Work stoppages could subject cancer patients to an in-

By contrast, I view this case as one involving the meaning of an ordinance which governs the conduct of the Borough with the same authority as a state statute. The ordinance has a specific mandate: all specifications must encourage maximum competition insofar as practicable. The case turns not on whether the Borough's action was reasonable in some general sense but on whether the specification in question encourages maximum practicable competition. And, as I have attempted to explain above, when this question is specifically addressed, the answer is clear: the PLA specification falls well short of the mark.

Second, today's opinion relies on a statement made in a concurring opinion by Justice Rabinowitz in *Libby v. City of Dillingham,* 612 P.2d 33 (Alaska 1980). The quoted statement is: "[A]s a general rule, municipal corporation competitive bidding requirements are construed narrowly, since '[i]n the absence of some statutory provision, competitive bidding is not an essential prerequisite to the validity of contracts by and with public bodies.'" Op. at 434 n. 15 (quoting *Libby,* 612 P.2d at 44 (Rabinowitz, J., concurring) (footnote omitted)). Such a rule has never been adopted by this court. Further, the

statement was dictum even in the context of Justice Rabinowitz's concurring opinion. The majority in *Libby,* including Justice Rabinowitz, strictly interpreted the statutory competitive bidding requirements to invalidate a negotiated lease entered into by the city.[14]

*Libby* does not therefore stand for the proposition that the requirements governing municipal corporation competitive bidding are not strictly enforced. Further, none of our other cases have, to my knowledge, indicated that public bidding requirements should not be strictly enforced. *E.g., McBirney & Assocs. v. State,* 753 P.2d 1132, 1138 (Alaska 1988) (voiding lease agreement due to irregularities in bidding process, noting that "this court has shown itself willing to protect the integrity of the state's competitive bidding process on numerous occasions."); *State v. Bowers Office Prods., Inc.,* 621 P.2d 11, 14 (Alaska 1980) (upholding administrative decision strictly enforcing bidding procedures); *Kelly v. Zamarello,* 486 P.2d 906, 918–19 (Alaska 1971) ("[S]trict maintenance of the competitive bidding procedures required by law is infinitely more in the public interest than obtaining a pecuniary advantage in individual cases by permitting

---

creased risk of infection and foreclose treatment opportunities for those waiting to be admitted. *Id.* Such concerns mirror the Borough's emphasis on the need to ensure uninterrupted class schedules for Lathrop High students during periods of construction. As significant as these objectives were, the New York court concluded that the use of a PLA simply could not be justified absent convincing evidence that its adoption furthered competitive bidding goals. *Id.* at 488, 666 N.E.2d at 193. Cautioning against "post hoc rationalization," the court noted that the record was devoid of specific projections of cost savings and legitimate concerns of labor unrest. *Id.* The record established by the Borough in support of its PLA is equally threadbare in particulars. By contrast, before deciding to adopt a PLA for the four-year project to improve the Tappan Zee Bridge, the Thruway Authority hired a consultant to prepare a comprehensive report of estimated labor savings. *Id.* at 486, 666 N.E.2d at 191. These cost savings were ultimately projected at $6 million. *Id.* Concerns for efficient construction stemmed not only from issues of public safety and convenience, but from the $45 million in yearly revenue generated from the toll bridge. *Id.* at 485, 666 N.E.2d at 190. Moreover, the bridge had previously been the target of labor unrest that required police inter-

vention. *Id.* Thus, the Authority's "detailed focus on the public fisc," the size and complexity of the project and the demonstrated history of labor unrest convinced the New York court that the PLA was "directly tied" to competitive bidding goals. *Id.* at 486, 666 N.E.2d at 191. In view of the fact that the Borough has failed to adequately justify the PLA on the record before us, I suggest that the New York Court of Appeals' conclusion with respect to the renovation of the cancer facility would also be applicable here:

> To say that [the public owner's] adoption of the PLA is justified simply by its desire for labor stability so that the work will be completed on time is tantamount to wholesale approval of PLAs—every public entity wants its projects completed on time, and public projects are presumptively important to the public. The competitive bidding requirements, however, demand that something more be shown in order to justify the significant restrictions imposed by PLAs.

*Id.* at 488–89, 666 N.E.2d at 193–94.

**14.** In reaching this conclusion, Justice Rabinowitz found untenable the city's determination that the leased facility was a "beneficial new industry" and thus exempt.

practices which do violence to the spirit and purpose of the law.") (quoting *Superior Oil Co. v. Udall,* 409 F.2d 1115, 1119–20 (D.C.Cir.1969)).

Third, today's opinion implies that because the Assembly acted in conjunction with the Borough mayor in approving the PLA specification, we should be less rigorous in our review for compliance with the maximum free and open competition clause of section .010. Op. at 435–436 n. 19. A resolution passed by a legislative body does not change the meaning of a law or ordinance. *See State v. A.L.I.V.E. Voluntary,* 606 P.2d 769, 773–74 (Alaska 1980) ("A mere resolution ... is not a competent method of expressing the legislative will, where that expression is to have the force of law ....") (quoting *Mullan v. State,* 114 Cal. 578, 46 P. 670, 672 (1896)). Further, a legislative body has no special competence to interpret the meaning of an enactment of an earlier legislature. *University of Alaska v. Tumeo,* 933 P.2d 1147, 1156 (Alaska 1997). Thus, I fail to see how the existence of the Assembly resolution can affect our duties on appeal.